Page 1

---

BEFORE THE DISCIPLINARY BOARD
OF THE SUPREME COURT OF PENNSYLVANIA

---

OFFICE OF DISCIPLINARY  :

COUNSEL                 :

                      :

       vs.          :

                      :

JOHN KELVIN CONNER    : NO. 29-DB-2018

---

THURSDAY, JUNE 21, 2018

---

        Disciplinary Hearing in the
above-captioned matter was held at Offices of
Disciplinary Counsel, 820 Adams Avenue, Suite 170,
Trooper, Pennsylvania at 9:45 a.m., on the above
date, before Sheila Klos, Registered Court
Reporter and Notary Public in the Commonwealth of
Pennsylvania.

MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



```
 1   APPEARANCES:
 2   DISCIPLINARY BOARD:
     JEFFREY KRAWITZ, ESQUIRE-Chair
 3   MAUREEN McBRIDE, ESQUIRE
     MICHAEL SAILLE, ESQUIRE
 4
 5
     OFFICE OF DISCIPLINARY COUNSEL
 6   BY:  DANIEL WHITE, ESQUIRE
     820 Adams Avenue, Suite 170
 7   Trooper, Pennsylvania  19403
     610.650.8210
 8   Daniel.white@pacourts.us
              Office of Disciplinary Counsel
 9
10   THE CONNER LAW GROUP
     BY:  JOHN K. CONNER, ESQUIRE
11   766 Old York Road
     Jenkintown, Pennsylvania  19046
12   215.876.0227
     Jconner@jconnerlawgroup.com
13            Counsel for Respondent
14
15
16
17
18
19
20
21
22
23
24
```



```
 1                    I N D E X

 2

 3   WITNESS:                        PAGE

 4

 5   SARAH FAUNTLEROY

 6         BY: MR. WHITE:     20, 77, 82

 7         BY: MR. CONNER:        23, 81

 8         BY: MS. McBRIDE:          80

 9

10

11   SETH MALTZMAN, ESQUIRE

12         BY: MR. WHITE:            83

13         BY: MR. CONNER:           88

14         BY: MS. McBRIDE:          92

15

16

17   JOHN CONNER, ESQUIRE

18         BY: MR. CONNER:           97

19         BY: MR. WHITE:           127

20         BY: MR. KRAWITZ:     200, 208

21         BY: MR. SAILLE:      203, 211

22         BY: MS. McBRIDE:     205, 209

23

24
```



Page 4

```
 1                        ---

 2          MR. KRAWITZ:  I'm going to call the

 3     hearing to order.  My name is Jeff Krawitz.

 4     I'm from Stark and Stark and I am the Chair of

 5     this Hearing Panel.  I'll allow my other, the

 6     other panel members to introduce themselves at

 7     this time.

 8          MS. McBRIDE:  Maureen McBride.

 9          MR. SAILLE:  Michael Saille of Cordisco

10     and Saille in Trevose, Pennsylvania.

11          MR. KRAWITZ:  Can I have the appearances

12     of counsel?

13          MR. WHITE:  Daniel White on behalf of the

14     Office of Disciplinary Counsel.

15          Mr. CONNER:  John Kelvin Conner,

16     Respondent.

17          MR. KRAWITZ:  Thank you.

18          I am obligated to read a statement into

19     the record for disciplinary hearings.  I'm

20     going to read that statement now and we'll

21     move on.

22          Pursuant to Section 89.151 of the

23     Disciplinary Board rules, the Respondent

24     hereby notified that after this Hearing
```



Page 5

1       Committee makes its finding on the issue of

2       alleged misconduct, the participants are then

3       entitled to offer any evidence which is

4       relevant and material on the issue of the type

5       of discipline to be imposed.

6           The Respondent is further advised that

7       any finding of this committee as to the

8       alleged misconduct and/or the type of

9       discipline to be imposed is only a

10      recommendation to the Disciplinary Board.  The

11      Board has the power to accept or reject the

12      findings and the recommendation of the Hearing

13      Committee.

14          If the Board rejects the findings and the

15      recommendation of the Hearing Committee, the

16      Board in turn, has that power to either

17      increase or decrease the recommended

18      discipline of the Hearing Committee if they

19      find professional misconduct.

20          In the event the Board finds public

21      discipline to be appropriate, the Board's

22      decision relevant to the alleged misconduct

23      and/or the type of discipline to be imposed is

24      not considered a final order, but only a



Page 6

1    recommendation which is submitted to the

2    Supreme Court of Pennsylvania for the court's

3    deliberation.

4        The Supreme Court of Pennsylvania, in

5    turn, will consider the matter de novo and

6    will issue a final order either accepting the

7    recommendations of the Board, dismissing the

8    petition for discipline or increasing or

9    decreasing the type of discipline recommended

10   by the Board.

11       In the event the Disciplinary Board

12   concludes that a matter should be resolved by

13   private discipline, the participants have

14   limited rights to request review of the

15   Board's findings by the Supreme Court of

16   Pennsylvania pursuant to the Pennsylvania

17   Rules of Disciplinary Enforcement.  Again,

18   once the matter reaches the Supreme Court, the

19   Courts have that power to increase or decrease

20   the discipline recommended by the Board.

21       Usually at this time, I would ask for

22   opening statements, but I understand that the

23   IDC may have additional stipulations to

24   present.



1          MR. WHITE:  Yes.

2          Mr. Conner and I entered into a second

3     stipulation this morning.  I have previously

4     marked this document as ODC Exhibit 2.  With

5     the Panel's permission, I'd like to provide a

6     copy of that to members of the panel.

7          MR. KRAWITZ:  Sure.

8          What I think would be most prudent at

9     this point is if we could take just a

10    few-minute recess given this additional

11    stipulation of the parties so that the panel

12    can consider these stipulations and have them

13    in mind as we proceed on with the hearing.

14         Is that okay with the parties?

15         MR. WHITE:  Yes, sir.

16         MR. CONNER:  It's fine.

17         MR. KRAWITZ:  Thank you.

18         (Whereupon, a break was taken off the

19    record.)

20         MR. KRAWITZ:  Thank you.

21         We are back on the record.  And we have

22    had an opportunity to review the additional

23    stipulations and we appreciate it.

24         At this time, counsel for IDC, would you



Page 8

1       like to make an opening statement?

2              MR. WHITE:  Yes.

3              MR. CONNER:  Beforehand, I would just

4       like to make a motion of sequestration of -- I

5       did get a list of witness.  Just to be

6       cautious, I'd ask for sequestration of the

7       Disciplinary Counsel's witnesses.

8              MR. WHITE:  No objection.  None of my

9       witnesses are in the hearing room at this

10      time.

11             MR. KRAWITZ:  Okay, very well.  You may

12      proceed.

13             MR. WHITE:  Did Sarah Fauntleroy

14      authorize John Conner to spend tens of

15      thousands of dollars of her funds at Parx

16      Casino, the Borgata, the Tropicana and

17      Sugarhouse casinos?  That's the narrow factual

18      issue that the Panel is here this morning to

19      determine.

20             Why do I say that?  In April of this

21      year, Mr. Conner and I entered into an

22      extensive stipulation regarding the facts of

23      this case.  I have previously distributed this

24      stipulation to the Panel, but I would like to


MAGNA
LEGAL SERVICES

Page 9

1     highlight some of the uncontested facts this

2     morning.

3          First, on July 29th, 2016, Ms. Fauntleroy

4     executed a General Durable Power of Attorney

5     in Mr. Conner's favor.

6          Second, in connection with this Power of

7     Attorney, Mr. Conner signed an acknowledgment

8     executed by an agent in which he acknowledged

9     that absent some contrary provisions, the

10    Power of Attorney or an applicable

11    Pennsylvania statute when acting as Ms.

12    Fauntleroy's agent, he would exercise his

13    powers for Ms. Fauntleroy's benefit.

14         Third, beginning on August 24th, 2016,

15    less than one month after Ms. Fauntleroy

16    signed the Power of Attorney and continuing

17    for the next eight to nine months, Mr. Conner

18    executed more than 100 point of sale

19    transactions against Ms. Fauntleroy's Wells

20    Fargo account at various casinos.  The total

21    amount of these transactions is $78,439.10.

22         And fourth, none of these transactions

23    were for Ms. Fauntleroy's benefit.

24         Additionally, Mr. Conner and I entered



1        into a second stipulation this morning in

2        which Mr. Conner admits to executing 79 ATM

3        withdrawals against Ms. Fauntleroy's Wells

4        Fargo account in the total amount of

5        $21,318.24.

6            You will hear Ms. Fauntleroy testify this

7        morning that she never authorized Mr. Conner

8        to use his funds at a casino.  Mr. Conner

9        never asked for her permission to use her

10       funds at a casino and had he done so, she

11       would not have granted him such permission.

12           In answer to the Petition for Discipline,

13       Mr. Conner says that Ms. Fauntleroy was aware

14       of and authorized the more than 100 sales

15       transactions that he executed against her

16       Wells Fargo account at various casinos.

17           In support of this assertion, Mr. Conner

18       will offer only his own self-serving

19       testimony.  To be clear, Mr. Conner will offer

20       no documentary evidence in support of his

21       assertion that Ms. Fauntleroy authored him to

22       use her personal funds at a casino.

23           Now, the Petition for Discipline in this

24       matter charged two violations of the rules of



Page 11

1    professional conduct, 8.4B and 8.4C.  Rule

2    8.4B provides that it is professional

3    misconduct for a lawyer to commit a criminal

4    act that reflects adversely on the lawyer's

5    honesty, trustworthiness or fitness as a

6    lawyer on other respects.

7        The criminal act in this case is theft by

8    failure to make required disposition of funds

9    received.  I included the statutory language

10   in the Petition for Discipline and I will

11   include it again in my brief.  I'd like to

12   provide it to the Panel this morning as well.

13       A person who obtains property upon

14   agreement subject to a known legal obligation

15   to make specified payments or other

16   disposition whether from such property or its

17   proceeds or from his own property to be

18   reserved in an equivalent amount, is guilty of

19   theft if he intentionally deals with the

20   property obtained as his own and fails to make

21   the required payments or disposition.

22       By virtue of the Power of Attorney, Mr.

23   Conner had access of the funds of Mr.

24   Fauntleroy's Wells Fargo account.  He



Page 12

1    intentionally dealt with these funds as his

2    own and converted them for his own purposes at

3    various casinos.

4         There may be no crime that reflects more

5    adversely on a lawyer's honesty,

6    trustworthiness or fitness as a lawyer than

7    the theft of fiduciary funds.

8         Rule 8.4C provides that it is

9    professional misconduct for a lawyer to engage

10   in conduct involving dishonesty, fraud, deceit

11   or misrepresentation.  The theft of fiduciary

12   funds epitomizes dishonesty, fraud and deceit.

13        As I mentioned, the Petition for

14   Discipline in the matter charged two

15   violations of the Rule of Professional Conduct

16   8.4.  And I believe Comment 4 to this rule is

17   particularly applicable to this case.  Lawyers

18   holding public office assume legal

19   responsibility going beyond those of other

20   citizens.  A lawyer's abuse of public office

21   can suggest an inability to fulfill the

22   professional role of lawyers.

23        The same is true of abuse of positions of

24   private trust such as trustee, executor,



1       administrator, guardian, agent and officer,

2       director or manager of a corporation or other

3       organization.

4           Sanctions in this case must be severe.

5       An individual who is willing to abuse a

6       position of private trust in order to steal

7       tens of thousands of dollars from a vulnerable

8       unsuspecting woman is unfit to practice law.

9       Thank you.

10          MR. KRAWITZ:  Thank you.

11          Mr. Conner, would you like to make an

12      opening now or reserve?

13          MR. CONNER:  I'll make my opening now.

14      Thank you.

15          MR. KRAWITZ:  Thank you.  You may

16      proceed.

17          MR. CONNER:  Good morning.  I have been

18      brought before this panel and accused of lying

19      and stealing.  The petition which has been

20      filed by Disciplinary Counsel basically

21      alleges that I committed a criminal act

22      violation of 18 PACS Section 3927A which

23      Disciplinary Counsel has read.

24          I submit to this panel that I have not



Page 14

1    lied nor have I stolen any money from anyone.

2    I have never stolen in my life and I am here

3    to aggressively defend myself.

4         In response to these allegations, I would

5    like the Panel to know right off the bat, and

6    evidence will come forward through my

7    testimony or through my cross-examination of

8    their testimony, that I, in fact, paid Ms.

9    Fauntleroy $8706.97 more than what she was

10   entitled to receive.

11        This mistake was based on the fact that

12   once my Power of Attorney was revoked, neither

13   Ms. Fauntleroy nor any of her caretakers or

14   assistants were providing me with any banking

15   documentation to come up with the exact

16   figure.  And, therefore, I returned a check to

17   her, once she revoked my Power of Attorney, in

18   the amount of $67,708.15.  I did that based on

19   the information that I had at the time.

20        Once I was able to receive all of the

21   banking documentations from Disciplinary

22   Counsel, I was able to go back and I was able

23   to do an amended summary.  And based on the

24   amended summary, the amount of overpayment,



Page 15

1          $8706.97 is what I paid to Ms. Fauntleroy.

2              Disciplinary Counsel has given you two

3      documents that I stipulated to.  One of those

4      documents outlines use that I made of Ms.

5      Fauntleroy's bank card while I was attending

6      casinos.  The other stipulation is similar in

7      that it details, itemizes times that I used

8      Ms. Fauntleroy's bank card at the casinos to

9      make withdrawals from the ATM.

10             Those transactions are set forth in every

11     bank statement that was issued on this

12     particular account that went directly to Ms.

13     Fauntleroy.  I spoke to Ms. Fauntleroy about

14     these transactions.  These transactions took

15     place from August all the way -- August of

16     2016 all the way through April of 2017.  Every

17     single solitary transaction is listed on those

18     bank accounts that didn't come to me but

19     actually went to Ms. Fauntleroy.

20             I reviewed those statements with her on

21     numerous occasions.  We went over the

22     transactions that were taking place.  And

23     there was never a complaint or nothing ever

24     said by Ms. Fauntleroy revoking what she had



1       told me that I was able to use the card for.

2           I think it's important for the Panel to

3       understand that that card wasn't just used

4       randomly by me.  It was used for that specific

5       intent.  We talked about it.  She gave me the

6       authority to do that.

7           I think that one of the issues here is

8       that Disciplinary Counsel was saying that

9       there is close to $100,000 worth of

10      transactions that took place in the account

11      and they are arguing that I didn't pay any of

12      that money back.

13          What they fail to take into

14      consideration, though, is that while those

15      transactions were taking place, use of the

16      card -- not that Ms. Fauntleroy gave me any

17      money.  She allowed me to use the card with

18      the understanding that I would pay the money

19      back.

20          During the period of time from August

21      through April of 2017, I made 23 cash deposits

22      into that account for money that I had used on

23      the card and I constantly told Ms. Fauntleroy

24      about that.



1           So although Disciplinary Counsel wants

2      you to think that that was an accumulative use

3      and that those payments that had been taken

4      was growing, it actually was not.  It was not

5      growing because I was putting money back into

6      the account.  And I have documentation to

7      support all of that.

8           My evidence will show that the total

9      amount of money that Ms. Fauntleroy had access

10     to based on her pension and based on an

11     investment account that she had, between

12     August 1st, August 1st of 2016 and April 27th

13     of 2017, the total amount of money that she

14     got, a combination of her pension and a

15     combination from an investment that I cashed

16     out for her, amounted to $137,385.55.

17          Total expenses that I paid on behalf of

18     Ms. Fauntleroy, most of which are clearly

19     documented in the bank receipts or the bank

20     statements came to $78,384.37.  Meaning that

21     at the time she revoked my Power of Attorney,

22     monies that I had control over that belonged

23     to Ms. Fauntleroy total $59,001.18.

24          She revoked my Power of Attorney on April



Page 18

1    27th of 2017.  I didn't know about that until

2    I went to deposit money into her account on

3    April 28th of 2017.

4         Ms. Fauntleroy's caretakers or Ms.

5    Fauntleroy would not talk to me about this

6    situation at all.  And as I stand here today,

7    I have never talked to Ms. Fauntleroy about

8    it, although I attempted to.

9         But knowing that I was no longer, I no

10   longer had control over her account, I

11   immediately called, left messages with her

12   caretakers that I would return to her any

13   monies that were owed to her.  And at that

14   time, I sent her a letter.  I sent her an

15   account summary and I sent her a check in the

16   amount of $67,708.15.

17        And again, I didn't know at the time that

18   the only money that I owed her was the balance

19   of the monies that had come in that were still

20   left outside which I had spent on expenses.

21   And that amount was $59,001.18.  That's why I

22   say that I overpaid her $8706.97.

23        I will also explain that I provided legal

24   services for Ms. Fauntleroy from March of 2016



Page 19

```
1        up until the time she revoked my Power of

2        Attorney which would have been April 27th of

3        2017.  And I think that's important for the

4        Panel to know right up front and I will

5        explain to you the legal services that I

6        provided.  For over a year's worth of legal

7        services that I provided, and I have been

8        practicing law for over 20 years now, I only

9        took for a salary $9500.

10            At the time that Ms. Fauntleroy initially

11       retained me to help her out with her finances

12       when she gave me access to her account, she

13       had a balance of negative $771 in her account.

14       And I say that to the Panel because the

15       services that I provided for her which we'll

16       go into detail with for over a year, that

17       $9500 was the only money that I received for

18       my legal services.  So not only did I overpay

19       her over $8000, I also worked for her during

20       that on a pro bono basis.

21            I adamantly deny that I lied about

22       anything.  I stipulated to the use of that

23       card up at the casinos because it wasn't a lie

24       and I didn't lie about the permission to do
```



```
                                              Page 20
 1      that.  And again, we'll get into that when I
 2      get an opportunity to talk to Ms. Fauntleroy.
 3      I have never lied to Ms. Fauntleroy about
 4      anything.  I never lied to Disciplinary
 5      Counsel about anything.  And I never stole one
 6      dime from anyone.  Thank you.
 7           MR. KRAWITZ:  Thank you.
 8           MR. WHITE:  I move for the admission of
 9      ODC Exhibits 1 and ODC Exhibit 2, the
10      stipulations that were previously provided to
11      the Panel.
12           MR. KRAWITZ:  So admitted.
13           MR. WHITE:  Would the Panel like
14      additional copies of ODC Exhibit 1?
15           MR. KRAWITZ:  No.
16           MR. CONNER:  Exhibit 1 and 2 are the
17      stipulations?
18           MR. KRAWITZ:  Yes.
19           MR. WHITE:  Here is a copy.
20           The Office of Disciplinary Counsel calls
21      Sarah Fauntleroy.
22           MR. KRAWITZ:  Very well.
23           MR. WHITE:  Ms. Fauntleroy's caretaker
24      will request continuing permission to approach
```



Page 21

1        the witness throughout her testimony should

2        she require any physical assistance.

3               MR. KRAWITZ:  Fine by me.  Do you have

4        any --

5               MR. CONNER:  No problem.  No objection.

6               MR. KRAWITZ:  Ms. Fauntleroy, good

7        morning.

8               THE WITNESS:  Good morning.

9               MR. KRAWITZ:  We are going to swear you

10       in and then there is going to be questions

11       asked of you.  Do you understand?

12              THE WITNESS:  Yes.

13                      ---

14               SARAH FAUNTLEROY, after having been duly

15       sworn, was examined and testified as follows:

16                      ---

17                      EXAMINATION

18                      ---

19   BY MR. WHITE:

20       Q    Good morning, Ms. Fauntleroy.  Good

21   morning.

22       A    Good morning.

23       Q    Ms. Fauntleroy, how do you know John

24   Conner?



Page 22

1      A    He was my Power of Attorney.

2      Q    How long did he serve as your Power of

3   Attorney?

4      A    I don't know.  Maybe about a year plus.

5      Q    Ms. Fauntleroy, do you have a checking

6   account at Wells Fargo?

7      A    I did.

8      Q    At any time was Mr. Conner's name on this

9   account?

10     A    Yes.

11     Q    Ms. Fauntleroy, has Mr. Conner ever asked

12  for your permission to use the money in your Wells

13  Fargo account at a casino?

14     A    No.

15     Q    Had he done so, would you have given him

16  such permission?

17     A    No.

18     Q    Did Mr. Conner ever tell you that he was

19  going to be using the money in your Wells Fargo

20  account at a casino?

21     A    No, he did not.

22     Q    Ms. Fauntleroy, have you ever told Mr.

23  Conner that he could use the money in your Wells

24  Fargo account at a casino?



Page 23

```
1       A    No, I did not.

2       Q    Did Mr. Conner ever ask you to sign a

3   document that authorized him to use the money in

4   your Wells Fargo account at a casino?

5       A    No.

6       Q    Have you ever signed such a document?

7       A    No.

8       Q    Ms. Fauntleroy, are you aware of any

9   document that authorized Mr. Conner to use the

10  money in your Wells Fargo account at a casino?

11      A    No, I did not.

12      Q    Ms. Fauntleroy, have you ever been to

13  Parx Casino in Bensalem, Pennsylvania?

14      A    No.

15      Q    Have you ever been to the Borgata Hotel

16  Casino and Spa in Atlantic City, New Jersey?

17      A    No.

18      Q    Ms. Fauntleroy, did you file a complaint

19  with my office in October of 2017?

20      A    Yes.

21      Q    What was the nature of that complaint?

22      A    To find out how much money I had.

23      Q    Did you find out how much money you had?

24      A    Not to the penny, no.  But I knew I had
```



Page 24

1   money.

2      Q   Ms. Fauntleroy, would it surprise you

3   that Mr. Conner has admitted to spending almost

4   $100,000 of the funds in your Wells Fargo account

5   at various casinos?

6      A   Yes, it would.

7      Q   Why is that?

8      A   Because I don't know where it would have

9   come from.  All I had is my pension.

10      Q   Ms. Fauntleroy, did you authorize Mr.

11   Conner to pay himself a salary in the amount of

12   $9500 in exchange for legal services he provided

13   to you?

14      A   No, I did not.

15      MR. WHITE:  I have nothing further.

16      MR. KRAWITZ:  Cross-examination?

17   BY MR. CONNER:

18      Q   Good morning, Ms. Sarah.  How are you?

19      A   Fine, thank you.

20      Q   Good.  Good.

21      Ms. Sarah, you met me in March of 2016 at

22   your home; isn't that correct?  I came to your

23   home in March of 2016 was the first time you met

24   me?



Page 25

1      A      Um-hum.

2      Q      And your bother, Lorenzo, he brought me

3    to your house; didn't he?

4      A      Yes.

5      Q      The reason Lorenzo brought me to your

6    house was because you were having some trouble

7    with your finances; isn't that correct?

8      A      Well, not troubles as much as the fact I

9    wasn't aware that I needed a Power of Attorney

10   until after we talked.

11     Q      Okay.  Let me see if I can refresh your

12   recollection.

13           Back in March of 2016 when I came to your

14   house, do you know a gentleman named Homer Hills?

15     A      Yes.

16     Q      Wasn't Homer Hills your Power of Attorney

17   back in March?

18     A      Yes.

19     Q      Right.  And Homer Hills was your Power of

20   Attorney and your head caretaker at that time was

21   Ms. Thomas, correct?  Shelio Thomas, she was your

22   caretaker?

23     A      Yes.

24     Q      And the reason you had your brother,



1    Lorenzo, bring me to your house was because you

2    were having problems with your money, your

3    finances?  You didn't know where your money was

4    going.  Do you remember that?

5         A    Yeah, right.

6         Q    You hired me as an attorney to try to

7    take a look at your finances and figure out where

8    your money was going?

9         A    Right.

10        Q    It was at that time that you turned over

11   to me all of the documents that you had regarding

12   your finances, correct?

13        A    Yes.

14        Q    And I took all of those documents.  And I

15   told you that I was going to try to reconstruct

16   them to try to give you some indication as to what

17   was going on with your finances at that time.

18   Isn't that correct?

19        A    Um-hum.

20        Q    At that time, I wasn't your Power of

21   Attorney.  Homer Hills was.

22        A    Yeah.

23        Q    Now, between March when I first met you

24   in 2016 and July, the end of July of 2016, I spent



1    time, I made several trips to your house going

2    over with you what your finances were, correct?

3        A    I don't remember you going over with me

4    because I never thought I had that much money.

5        Q    Okay.  I'm talking to you now about my

6    activities and my involvement with you between

7    March of 2016 up to the end of July of 2016.

8    Okay?  That period of time.

9            MS. McBRIDE:  Ma'am, you have to answer

10       "yes" so that the court reporter can take it

11       down.  Okay?

12   BY MR. CONNER:

13       Q    Isn't that right?  That I did legal work

14   for you trying to help you figure out your

15   finances during that period of time, correct?

16       A    Um-hum.

17       Q    You gave me all of your financial

18   documents to review, correct?

19       A    There wasn't anything to review, was it?

20   You told me you got, that everything was squared

21   away.  All the papers were correct and all of the

22   papers that I needed to give to somebody was given

23   to you by my niece.  She is the only relative that

24   I have.  So everything went to her.  She gave you



Page 28

```
1    all of the papers there were.
2         Q    Okay.  All right.  So between March and
3    July, the end of July of 2016, I was reviewing
4    those documents to determine what was going on
5    with your finances.  Would you agree with that?
6         A    Yes.
7         Q    Is that a "yes"?
8         A    Yes.
9         Q    Now, during that period of time, Ms.
10   Fauntleroy, you were partially disabled; isn't
11   that correct?  You had had a stroke?  You were
12   partially disabled?
13        A    Yes.
14        Q    And you lived at 1634 North 30th Street
15   in Philadelphia?
16        A    Yes.
17        Q    And you lived there with your dog, Sasha
18   and your two cats?
19        A    Right.
20        Q    But you also needed 24-hour a day
21   caretakers?
22        A    Yes.
23        Q    You couldn't live by yourself?
24        A    Right.
```



Page 29

1    Q    And you had to pay those caretakers?

2    A    Right.

3    Q    You had to pay caretakers for care 24

4    hours a day.

5    A    Right.

6    Q    So when you called me or asked your

7    brother to bring me to your house, your concern

8    was that you were not going to have enough money

9    to pay your caretakers, correct?  You thought your

10   money was running out?

11   A    Yes.

12   Q    Right.  That's why you wanted to me to

13   look into it, correct?

14   A    Right.

15   Q    And, in fact, Ms. Fauntleroy, your money

16   did run out.  And it ran out the end of July of

17   2016; isn't that correct?

18   A    If you say so.  I don't know exactly when

19   it would, but I knew you said it was running out

20   for 24-hour care.

21       MR. CONNER:  May I approach?

22       MR. KRAWITZ:  You may.

23       MR. CONNER:  This document has been

24   marked RS-6.



```
 1          MR. WHITE:  If I can be heard.

 2          I don't have an objection.  It's a bank

 3     statement.  I don't have an objection to the

 4     admissibility.  I believe it has Ms.

 5     Fauntleroy's entire account number.  I'd like

 6     to include a confidential document form on top

 7     of it.  I actually did propose this as an

 8     exhibit as well.  It has a confidential form

 9     on top of it if Mr. Conner prefers to use that

10     instead.

11          MR. KRAWITZ:  Why don't we use that.

12          MR. CONNER:  I can.

13          MR. WHITE:  Do you have that, sir?

14          MR. CONNER:  I do.  If you have your

15     hands right on it, I'll use it.

16          MR. WHITE:  Which?

17          MR. CONNER:  It's the one from July 14th,

18     2016 to August 10th, 2016.

19          I don't know how -- do you want to mark

20     this still as RS-6, the same document?

21          MR. KRAWITZ:  If it was previously marked

22     or marked in advance.

23          MR. WHITE:  It's previously marked

24     ODC-3A.
```



Page 31

1            MR. CONNER:  I beg the Panel's

2     indulgence.

3     BY MR. CONNER:

4        Q    Ms. Fauntleroy, if I show you this

5     document, can you take a look at it and see if

6     you -- first of all, do you recognize the name and

7     the address on there?  Is that your name, Sarah

8     Fauntleroy?

9        A    Yes, it is.

10       Q    It says Homer Hills on there, Jr. as your

11    POA right underneath your name right here?

12    (Indicating)

13       A    Yes.

14       Q    This is for your Wells Fargo checking

15    account, correct?

16       A    Right.

17       Q    I'm going to flip over a page.  And it

18    has all the transactions on that account.  And I'm

19    going to ask you to go to a transaction here that

20    dates 7/15.  If you go all the way over to the end

21    it says Ending Daily Balance.  That says a

22    negative $771.39; isn't that correct, right there?

23    (Indicating)

24       A    $171.39.



1     Q     Does that say $771?

2     A     Yeah.

3     Q     So based on your bank statement, as of

4  July 15th, you only had negative $771.39 in your

5  account, correct?

6     A     That's what it says.

7     Q     Now, after your account went down to a

8  negative $771.39, you didn't have any money to pay

9  your caretakers, did you?  You didn't have any

10  money to pay your caretakers, did you?

11     A     No, not out of $771.

12     Q     And at that time, you asked me to come

13  back to your house because you knew that if you

14  didn't do something about that, that you weren't

15  going to be able to live there by yourself,

16  correct?

17     A     Um-hum.

18          MR. WHITE:  Ms. Fauntleroy, they need you

19     to answer "yes" or "no".  When you say

20     "um-hum", it doesn't come across on the

21     transcript.  So if you could answer "yes" or

22     "no" to the questions.

23          THE WITNESS:  Okay.

24          MR. KRAWITZ:  We didn't get an answer to



Page 33

```
1        the question.  Why don't we have the question
2        read back.
3             (Whereupon, the court reporter read back
4        the requested testimony.)
5             THE WITNESS:  Correct.
6             MR. CONNER:  May I approach?  I'd like to
7        mark the next exhibit RS-1.  This is Property
8        Power of Attorney.
9             MR. KRAWITZ:  Any objection?
10            MR. WHITE:  No objection.
11   BY MR. CONNER:
12        Q    Ms. Fauntleroy, I'm going to show you
13   what has been marked as Exhibit RS-1.
14            MR. KRAWITZ:  Do you have a copy for us?
15            MR. CONNER:  I believe I do.  I do.  I
16       beg your indulgence.  I'm working off of a
17       copy.  I'm going to present the Panel with the
18       original.  It's going to be three documents
19       I'm going to be referring to, RS-1, RS-2 and
20       RS-3.
21            RS-1 is the Property Power of Attorney.
22       RS-2 is a Durable Power of Attorney for
23       healthcare and RS-3 is the Last Will and
24       Testament.
```



1         MR. WHITE:  I would object to RS-2 and

2    RS-3.  They are simply not relevant.  The

3    Petition for Discipline alleges that he stole

4    money from Ms. Fauntleroy.  The Healthcare

5    Power of Attorney and the will aren't

6    relevant.

7         MR. KRAWITZ:  The objection is sustained

8    as to RS-2 and RS-3.

9         MR. CONNER:  Okay.  Assuming that if in

10   response to my answer to this question

11   necessitate this, then the Panel will

12   reconsider?

13        MR. KRAWITZ:  We won't make any

14   assumption.  We'll see how the questioning

15   goes.  If there is some foundation for you to,

16   or attempt to reoffer those exhibits, RS-2 and

17   RS-3, we'll deal with it at that time.

18        MR. CONNER:  Okay.  So at this time -- as

19   a matter of fact, I'll give you the copy.

20        MR. KRAWITZ:  Thank you.

21        MR. CONNER:  You are welcome.  This is

22   RS-1, the General Durable Power of Attorney to

23   which there is no objection.

24        MR. WHITE:  Correct.



Page 35

```
 1           MR. KRAWITZ:  Okay.

 2           MR. CONNER:  May I proceed?

 3           MR. KRAWITZ:  Sure.

 4  BY MR. CONNER:

 5      Q   Ms. Fauntleroy, I'm going to show you

 6  what's been marked as RS-1.  This is a Property

 7  Power of Attorney for you.

 8           Do you remember me coming to your house

 9  in July after you found out that there was no

10  money in your account and sitting down with me and

11  you and I preparing this document, this Power of

12  Attorney for me?

13      A   I don't remember sitting down, but I know

14  there was a Power of Attorney because I asked my

15  brother about Power of Attorney.

16      Q   Okay.  And Homer Hills had been your

17  Power of Attorney before, correct?

18      A   Yes.

19      Q   And I'm going to refer you to Page, I

20  guess it's the first actual page of this document.

21  Is that your signature on the bottom? (Indicating)

22      A   Yes.

23      Q   And you signed that on July 29th of 2016,

24  correct?
```



1       A     Yes.

2       Q     Before you signed this document, Ms.

3  Fauntleroy, you and I went over the terms in this

4  document because I wanted you to understand what

5  you were signing.  Do you remember that?

6       A     Yes.

7       Q     Now, Ms. Fauntleroy, on July 29th of 2016

8  at the time you and I went over this document and

9  you signed it, you had problems walking around

10 because of your stroke?  You had physical

11 problems, correct?

12      A     No, not walking then.

13      Q     Right.  You weren't walking.  So you had

14 some problems, some physical problems because of

15 your stroke, correct?

16      A     Really I have always been able to walk

17 with assistance.  There was never a time when I

18 couldn't just walk, period.

19      Q     Okay.

20            MR. WHITE:  I'll object to these

21      questions.  They are not relevant.

22 BY MR. CONNER:

23      Q     Ms. Fauntleroy --

24            MR. KRAWITZ:  One second.  Let me deal



1       with his objection.

2              If you want to somehow lay a foundation

3       for these, this line of questioning, we'll

4       consider it.

5              MR. CONNER:  I'll withdraw that.  I'll

6       withdraw that question.

7              MR. KRAWITZ:  Very well.

8    BY MR. CONNER:

9       Q    Ms. Fauntleroy, at the time we reviewed

10   this document and you signed it, you didn't have

11   any problem?  You understood what we were doing,

12   correct?

13      A    Yes.

14      Q    Right?  And at that time, at that time,

15   you were making all of the decisions regarding

16   your finances, your checking account?  Isn't that

17   correct?

18      A    Yes.

19      Q    And after you signed this document, you

20   still continued to make all of the decisions

21   regarding your checking account, didn't you?

22      A    Yes.

23      Q    As matter of fact, after you signed this

24   document, you, in fact, wrote checks off of that



Page 38

1    account; isn't that correct?

2        A    Not -- well, Mr. Hills had the Power of

3    Attorney.  He wrote it.  I didn't sign any checks,

4    any personal checks or anything.  Maybe a bill or

5    two, but that was all.

6        Q    Okay.  Let me just try to make sure we

7    are talking about the same thing.

8              On July 29th, 2016, you signed this

9    document that we marked as RS-1, this Power of

10   Attorney, correct?

11       A    Yes.

12       Q    At that time, you understood what was in

13   this document, correct?

14       A    I thought so.

15       Q    And there was nothing wrong with your

16   mind at that time?

17       A    No.

18       Q    You were able to understand everything,

19   correct?

20       A    Yes.

21       Q    Correct?

22       A    Yes.

23       Q    And at that time, you were still making

24   decisions regarding your checking account?  July,



Page 39

1    29th, 2016, correct?

2        A    Yes.

3        Q    And after you signed this Power of

4    Attorney, you continued to make decisions on your

5    checking account, correct?

6        A    On some things, yes.

7        Q    Okay.  And you, in fact, wrote checks?

8    You actually wrote checks off of this account

9    after you signed this Power of Attorney, correct?

10       A    Not that I'm aware of.

11           MR. CONNER:  Can I see the exhibit you

12       gave me, the checking statement?

13           MR. WHITE:  3A?

14           MR. CONNER:  3A.  I'm sorry.

15           I have copies of checks from that

16       account.  It wasn't included in Disciplinary

17       Counsel's exhibit.  But it is, I have marked

18       it as Exhibit 6A.  If you want me to, I can

19       cross out the account number which seemed to

20       have been the issue with my document.

21           MR. WHITE:  I would have the same problem

22       as with RS-6.  I would suggest just filling

23       out a confidential document form and putting

24       it on top.  I think that would be the



```
                                                Page 40
 1       appropriate course of action.
 2            MR. KRAWITZ:  I think that's the way we
 3       should do it.
 4            MR. CONNER:  Okay.  I beg the Panel's
 5       indulgence.
 6            MR. KRAWITZ:  Sure.
 7            Let's take a two-minute recess.
 8            MR. WHITE:  Very well.
 9            MR. CONNER:  Can I have instructions that
10       no one speak to the witness during this break
11       time?
12            MR. KRAWITZ:  Sure.
13            MR. CONNER:  Or speak to her regarding
14       the case.
15            MR. KRAWITZ:  Nobody is going to speak to
16       her.
17            MR. CONNER:  Thank you.
18            (Whereupon, a break was taken off the
19       record.)
20            MR. KRAWITZ:  Mr. Conner.
21   BY MR. CONNER:
22       Q   Ms. Fauntleroy, I had asked you if you
23   had written any checks off of your account after
24   you signed the Power of Attorney on July 29th of
```



Page 41

1    2016.  Do you remember that question?

2        A    Did I?  Not unless it was for household

3    utilities or something like that, but I never

4    wrote any personal checks.

5            MR. WHITE:  I'd ask for an offer of

6        proof.  Again, the allegation in the Petition

7        for Discipline is that Mr. Conner stole

8        Mr. Fauntleroy's funds.  He stipulated to

9        executing the transactions.  I don't

10       understand how Ms. Fauntleroy writing checks

11       against her own account is relevant to these

12       proceedings.

13           MR. KRAWITZ:  You have an offer of proof?

14           MR. CONNER:  The relevancy is there was a

15       Power of Attorney that was written and that

16       Power of Attorney was limited.  My testimony

17       is how it was limited.  It was limited for me

18       to write checks for specific reasons.  And

19       every other decision made on that account for

20       everything that took place on that account was

21       made by Ms. Fauntleroy.

22           And I want the record to show that she

23       continued to make decisions on that account

24       after the Power of Attorney was signed.



Page 42

1        MR. WHITE:   There is no allegation in the

2     Petition for Discipline that Ms. Fauntleroy

3     did not write checks against the account.

4        The only issue is whether Mr. Conner was

5     authorized to withdraw $100,000 from her

6     account through point of sale transactions and

7     ATM withdrawals from the casinos.

8        MR. CONNER:   Again, part of that is that

9     there was information and evidence that was

10    sought by Disciplinary Counsel about my

11    authority over that account.  And my authority

12    over that account was limited.  And this line

13    of questioning right now substantiates that.

14    I didn't have exclusive authority over the

15    account.  It was limited.

16       MR. KRAWITZ:   Is the objection as to

17    relevancy, I assume?

18       MR. WHITE:   Correct.

19       MR. KRAWITZ:   That objection is

20    sustained.

21  BY MR. CONNER:

22    Q   Ms. Fauntleroy, when I came to see you

23  back in March of 2016 and you asked me to provide

24  the legal services that we talked about, do you



Page 43

1    remember that conversation that we had here?  You

2    hiring me back in March to provide legal services

3    for you?  Do you remember that?

4        A    Well, I imagine that was when I

5    discovered I was running short of money for my

6    caretakers.

7        Q    Correct.

8             Do you remember what you agreed to pay me

9    for those legal services?

10       A    No. No.

11       Q    You don't remember?

12       A    No.

13       Q    But you know I wasn't working for free,

14   though, correct?

15       A    No.  I know there is no such thing as a

16   freebie, but I did not get a definite amount.

17   Just that you would take care of my bills for me.

18       Q    I just want to make sure I understand

19   what you are saying.

20            You knew that I was charging you for my

21   legal services, correct?  Nothing is free,

22   correct?

23       A    No.  I knew -- well, yeah, because you

24   were Power of Attorney.  But I didn't know how



1    much.

2       Q    I'm talking about before I became your

3    Power of Attorney.  From March all the way up

4    until the time I became your Power of Attorney, I

5    was providing legal services for you, correct?

6       A    No.  I wasn't aware.  I just thought that

7    you were going to be Power of Attorney.  And if

8    any problems came up, you would let me know.

9       Q    I'm going to try one more time.

10           When I was working providing legal

11   services for you trying to help you with your

12   finances between March and the time I became your

13   Power of Attorney, those were legal services that

14   I was providing for you, correct, trying to help

15   you find out what was going on with your finances,

16   right?

17      A    Yeah.

18      Q    That's when you turned over all of your

19   documents to me, correct?

20      A    Yeah.

21      Q    You knew that I wasn't working for free,

22   correct?

23      A    Right.

24      Q    But you are saying you don't know how



Page 45

1   much I was charging you?

2       A    Right.

3       Q    But I was charging you something, right?

4       A    Yeah.

5       Q    You didn't pay me one dime, did you,

6   between March --

7       A    I --

8       Q    Wait a minute.

9            Between March and up until the time you

10  signed the Power of Attorney which would have been

11  July 29th of 2016, you didn't pay me one dime, did

12  you?

13      A    Not that I know of.

14      Q    So at the time you signed the Power of

15  Attorney, you had a negative $771.36 in your

16  account, correct?

17      A    Right.

18      Q    And you didn't have any money to pay your

19  caretakers, did you?

20      A    Right.

21      Q    And you didn't have any money to pay me

22  either, did you?

23      A    Right.

24      Q    Do you remember your brother, Lorenzo



Page 46

1    Fauntleroy, giving me a check for $10,000?

2        A    Was it $10,000?  Yeah, I remember.

3    That's my brother and I borrowed money.

4        Q    Ms. Fauntleroy, that $10,000 check that

5    your brother gave me, that was for my legal

6    services that I have provided for you between

7    March, up until the time you signed and after you

8    signed your Power of Attorney; isn't that correct?

9        A    If you say so.

10       Q    And I didn't take one dime of that money.

11   I put that money into your account so that you

12   could pay your caretakers who you needed to take

13   care of you because without them, you wouldn't

14   have been able to live in that house.  Isn't that

15   correct?

16       A    True.

17       Q    Now, you have testified that you didn't

18   know that I was taking any money off of your card

19   and using it at the casino; isn't that correct?

20       A    Right.

21       Q    But every bank account from August, after

22   I became your Power of Attorney all the way

23   through the time you revoked the Power of Attorney

24   which would have been in April, April 27th of



1   2017, you received every bank account from that

2   checking, during that period of time?  It came to

3   your house, correct?

4           MR. KRAWITZ:  Bank statement?

5   BY MR. CONNER:

6       Q    Bank statement.  I'm sorry.  Bank

7   statement.  It came to your house, correct?

8       A    It came -- I don't remember seeing it,

9   but you say it came?  I don't doubt you.

10      Q    And you never looked at one of those

11  accounts, one of those bank statements?

12      A    No.

13      Q    You never looked at --

14      A    I looked at one that said about the money

15  I had borrowed from my bother.  That was all.

16      Q    When did you look at that one?

17      A    I don't have the date.  I guess when I

18  tried to figure out, did I have enough to pay the

19  caretakers?

20      Q    When you looked at that account, you

21  didn't see on there that transactions were being

22  made at the casino?

23      A    No.

24      Q    You didn't see any of that?



Page 48

```
 1     A    No.

 2     Q    When is the first time you saw that there

 3  were transactions being made at the casino?  When

 4  is the first time?

 5     A    I never saw.  But when the attorney told

 6  me that they had checks showing that I signed to

 7  the casino, I knew that I did not remember signing

 8  checks for the casino and I hadn't went there to

 9  do it myself.

10     Q    Okay.  And when was that?  When did the

11  attorney tell you that?

12     A    It must have been around -- before

13  Thanksgiving.

14     Q    Before Thanksgiving of 2017?

15     A    Yeah.

16     Q    After he told you that, you didn't come

17  to me, did you, and ask me about it?

18     A    Well, I had to say something to somebody

19  because I know I hadn't signed.  And I didn't have

20  that much money, I didn't think.  But I asked my

21  caretaker to inquire about it for me.

22     Q    Okay.  After you asked them to do that,

23  you never came to me and asked me about it, did

24  you?
```

