Page 49

1     A    No.

2     Q    And when you say you didn't believe that

3    you had enough money in your account, did you ask

4    your caretakers where the money came from?

5     A    No, I didn't ask them.  All I wanted to

6    know was, did they get paid?

7     Q    And they told you they did, didn't they?

8     A    Yes.

9     Q    While we are talking about that.  Your

10   caretakers, from the time you allowed me to get on

11   your checking account which would have been August

12   of 2016, all the way through the time you revoked

13   my Power of Attorney in April of 2017, all of that

14   time, those nine months, your caretakers got paid

15   every week, didn't they?

16    A    As far as I know.  None of them said that

17   they didn't.

18    Q    Excuse me?

19    A    Yes, they got paid.  And I said they

20   didn't say that they didn't get paid.

21    Q    Okay.  Okay.

22         So getting back to when you were saying

23   that you didn't think you had that much money in

24   your account.



```
 1      A    Right.

 2      Q    Did you ask your caretakers or did they

 3   tell you where the extra money came from that was

 4   in your account?

 5      A    No.

 6      Q    Ms. Fauntleroy, they didn't tell you that

 7   I put that money in your account?  You didn't know

 8   that, did you?

 9      A    No.

10      Q    So when they told you about me spending

11   money at the casino that you say you didn't know

12   about --

13      A    Right.

14      Q    Right -- they didn't tell you that that

15   money was being replaced, that I was putting that

16   money back in your account?  They didn't tell you

17   that, did they?

18      A    No.  Did you?

19      Q    (Response stricken)

20           MR. KRAWITZ:  You are not to testify

21      during your questioning.

22           MR. CONNER:  I apologize.

23           MR. KRAWITZ:  That's to be stricken from

24      the record, please.
```



Page 51

1    BY MR. CONNER:

2        Q    Okay.  So this was brought, the fact that

3    you are saying the first time you knew about me

4    using your card at the account -- using your card

5    at the casinos was brought to your attention in

6    November of 2016, correct?

7        A    Yes.

8        Q    But it wasn't until the end of April of

9    2017 that you revoked my Power of Attorney.  Do

10   you remember doing that?

11       A    I know it was revoked.

12       Q    Did you do it?  You did it?

13       A    Yes.

14       Q    Why did you do it then?

15       A    Because the money was getting confusing

16   to me.

17       Q    Okay.  Now, after you revoked my Power of

18   Attorney which would have been April 27th of 2017,

19   I sent you a letter with a check.  Do you remember

20   getting my letter with a check?

21       A    No.

22       Q    You don't remember me sending you a

23   letter on May 1st with a check in it for

24   $67,708.15?



Page 52

```
 1       A    No, I do not, sir.
 2            MR. CONNER:  I beg the court's
 3       indulgence.
 4            MR. KRAWITZ:  Sure.
 5            MR. CONNER:  May I approach?
 6            MR. KRAWITZ:  Sure.
 7            MR. CONNER:  I have three documents I'm
 8       going to ask Ms. Fauntleroy about.  They are
 9       out of order.  RS-17 is going to be a letter
10       certified mail dated May 1st, 2017 from me to
11       Ms. Fauntleroy.  RS-16 is going to be a copy
12       of the certified notice that was on the check
13       which was signed and returned to my office.
14       And RS-15 is going to be a copy of the actual
15       check.
16            MR. KRAWITZ:  Any objection?
17            MR. WHITE:  No objection to these
18       documents.  If it moves things along, I'm
19       willing to stipulate that Mr. Conner did
20       return the amount of this check, $67,708 by
21       way of that check.
22            MR. CONNER:  But it's important that she
23       knows I did it.
24            MR. KRAWITZ:  It's already stipulated.
```



Page 53

1           MR. CONNER:  She is saying she didn't

2      know.  I want the record to reflect that she

3      is saying she didn't know.  She is the one

4      bringing these allegations.

5           MR. WHITE:  Fair enough.

6           MR. KRAWITZ:  Okay.  Go ahead.  Proceed.

7    BY MR. CONNER:

8      Q    Ms. Fauntleroy, I'm going to show you

9    what's been marked as RS-17.  This is a letter

10   from me to you.  Did you ever see this letter?

11     A    No.

12     Q    I'm going to show you what's been marked

13   as RS-17.  This is a return receipt of that

14   letter.

15     A    Did I sign --

16     Q    Do you know whose signature is there?  Is

17   that your signature?

18     A    No.

19     Q    Whose signature is that; do you know?

20     A    It says Thomas.

21     Q    Shelio Thomas?

22     A    Shelio Thomas.  Yeah.

23     Q    Do you know who that is?

24     A    My caretaker.



Page 54

1      Q     And this letter is addressed to you at

2   1634 North 30th Street, correct?

3      A     That's where I reside.

4      Q     Okay.  I'm going to show you what's been

5   marked as RS-15.  This is a check.  Did you ever

6   see this check?

7      A     No.  Never.

8      Q     Never?

9      A     No.  I probably would have went to the

10  casino if I had seen that.

11     Q     Ms. Sarah --

12     A     Yes.

13     Q     Today is the first time that you knew

14  that I gave you back at the time you revoked my

15  Power of Attorney $67,708.15?

16     A     Yes.

17     Q     This is the first time you knew that?

18     A     Right.

19     Q     Ms. Sarah, between August 1st of 2016 all

20  the way through April 27th of 2017, you received a

21  pension check; is that correct?

22     A     Yes.

23     Q     Do you recall how much that pension check

24  was?



Page 55

1      A    Was it $10,000 or $12,000?  It was one of

2    the two other.

3           MR. CONNER:  I beg the Panel's

4       indulgence.

5    BY MR. CONNER:

6      Q    Ms. Fauntleroy, your pension, if I told

7    you that your pension you received each month was

8    $2828.62, does that sound right, your pension?

9      A    No.  I really thought I received more

10   than that.

11          MR. CONNER:  Can I see what is my RS-6,

12      that first bank statement that's been marked?

13          MR. WHITE:  I don't think you ever gave

14      it back to me.

15          MR. CONNER:  I have it.

16          May I approach again?

17          MR. KRAWITZ:  Sure.

18          What are we referring to?

19          MR. CONNER:  I'm referring, again, to --

20          MR. WHITE:  ODC-3A.

21          MR. KRAWITZ:  Thank you.

22   BY MR. CONNER:

23     Q    Ms. Fauntleroy, this is the document I

24   showed you before.  It's a copy of your bank



Page 56

1    statement from your Wells Fargo checking account.

2    I'm going to go to -- it's actually Page 3.

3    Sorry.  Yeah, Page 3 of that document.  And I'm

4    going to ask you to take a look at an entry from

5    August 1st which talked about an OPM treasury

6    check.  That's your pension check, correct?

7        A    Yes.

8        Q    Can you take a look and see what the

9    deposit is on August 1st from your pension check?

10   What does that say?

11       A    $2282.62.

12       Q    Take another look at it.  Right there.

13   What does that say?  2000 --

14       A    $2028.62.

15           MR. WHITE:  Again, I'm willing to

16       stipulate Ms. Fauntleroy received a monthly

17       pension payment in the amount of $2828.62.

18           MR. KRAWITZ:  Very well.

19   BY MR. CONNER:

20       Q    Ms. Fauntleroy, that money was deposited,

21   your checking account at Wells Fargo once a month,

22   correct?

23       A    Yes.

24       Q    And other than that pension check, you



Page 57

1  never deposited any other money into that account;

2  did you?

3      A    No, I did not.

4      Q    Now, after you found out back in July of

5  2016 that you didn't have any money in your

6  account, I took the $10,000 check that Mr.

7  Fauntleroy gave me and I put that in your account,

8  correct?

9      A    Thank you.

10     Q    In addition to that, Ms. Fauntleroy, I

11  found an investment that you had with Delaware?

12  Remember Delaware Investment Company?

13     A    Yes.

14     Q    And you authorized me to cash that

15  investment out so that you would have some

16  additional money.  Correct?

17     A    No, I don't remember doing that.  But if

18  you say so, it sounds good.

19     Q    And do you recall that the amount that

20  was in that investment, once it was cashed out,

21  was $112,000?  Do you remember that?

22     A    No.

23     Q    $112,702.60 from that investment.

24     A    Okay.



Page 58

1        Q     Do you remember that?

2        A     No.

3        Q     Do you remember that we opened up a

4    savings account at Wells Fargo and we put that

5    money in the savings account?

6        A     In the Wells Fargo savings account?

7        Q     Right.

8        A     Yeah.  Okay.

9        Q     All right.

10             So basically then what you are saying is

11   that from August 1st of 2014 through April 27th,

12   you had money that came in from two sources.  Your

13   pension was that $2800 amount.  That came in every

14   month, correct?

15       A     Yes.

16       Q     And money from the investment that we had

17   cashed out in the amount of $112,702.60.  Do you

18   remember that?

19       A     Thank you.

20       Q     So because you had a negative balance of

21   $771.39, when you added me to your checking

22   account, the total amount of money that you would

23   have had from August 1st of 2016 through the time

24   you revoked my Power of Attorney, April 27th of



Page 59

1    2016, the total amount of money was $137,385.55.

2    That's what you would have had in your account

3    during that period of time.  Does that sound right

4    to you?

5        A    Yes.

6        Q    Now, once I was authorized by you to be

7    on your checking account, you said that you wanted

8    me to pay your caretakers, correct?

9        A    Yes.

10       Q    And as far as you know, I did that every

11   week, right?

12       A    Yes.

13       Q    And you also wanted me to pay your bills?

14       A    Right.

15       Q    Now, your bills, Ms. Fauntleroy, all came

16   to your house, correct?  They were mailed to you?

17       A    Yeah.

18            MR. WHITE:  I'd ask for an offer of proof

19       again.  The bills aren't relevant.

20            MR. CONNER:  The bills are relevant.  I'm

21       accused of theft, of stealing.  And it's

22       important for me to establish for the record

23       how much money she had, what her expenses were

24       and what money was returned to her.



Page 60

1        And that's what I'm doing here.  I'm

2    asking her about how much money she had to

3    come into her possession, which she just

4    testified to.  And now I'm talking to her

5    about her knowledge of her expenses because

6    she has already testified what money she got

7    back.

8        If they are going to accuse me of

9    stealing, then we have to know what money I

10   stole.

11       MR. WHITE:  Mr. Conner stipulated to

12   executing over almost 200 transactions.  The

13   only issue left to be determined is whether

14   Ms. Fauntleroy authorized those transactions

15   or not.

16       MR. KRAWITZ:  That is not true.  The

17   complaint states that I committed a theft.

18   It's a criminal statute saying that I

19   committed a theft.  And that theft is the

20   basis of my alleged professional misconduct.

21   The theft, that's what is stated in there.  So

22   they have the burden of proof that there was a

23   theft.

24       The other statues, the Disciplinary Codes



Page 61

1     that relate to that all center around the fact

2     that I allegedly stole her money.  That's what

3     this complaint says.

4          MR. WHITE:  I agree.  But the bills

5     aren't relevant.  Whether the bills, what the

6     amount of the bills were, whether Mr. Conner

7     paid them or not, that's not relevant to the

8     Petition for Discipline which he stole money

9     for transactions at the casino.

10         MR. CONNER:  In order for them to

11    establish the fact that I stole money, we have

12    to know what money I stole, how much money she

13    had, how much money went to pay her expenses

14    and how much money was returned to her.

15        It's my position that over $8000 more

16    than what she was entitled to was returned to

17    her.  That doesn't establish a theft any kind

18    of way you want to look at it.

19        We are talking about a criminal statute.

20    And the basis of that criminal statute is that

21    the money was not paid back accordingly.

22        So there is a dispute as to whether or

23    not she says that I was authorized or not.  I

24    certainly disagree with that and we can argue



Page 62

```
 1      about that.  But the petition alleges that I
 2      violated the rules of conduct because I stole.
 3      So the theft --
 4          MS. McBRIDE:  My question is, is it your
 5      possession that it's not a theft if you took
 6      money that you weren't authorized to take but
 7      repaid it?  That's not a theft?  Is that your
 8      position?
 9          MR. CONNER:  My position is that I was
10      entitled, I was given permission to take the
11      money that the money was taken.  That once it
12      was brought to my attention --
13          MS. McBRIDE:  Wait a minute.  Let me stop
14      you there.  You said you understand the
15      testimony was that you were not authorized.
16      So let's assume for purposes of argument you
17      weren't authorized.
18          Is it your position that if you paid the
19      money back, that's not a theft?
20          MR. CONNER:  No.  No, that's not my
21      position.
22          My position, though, is that I was
23      authorized, that there was no demand made for
24      that and that I repaid that money plus some.
```



Page 63

```
 1          That's my position.
 2               I can't just say, I can't just argue back
 3          and forth as to whether or not I had
 4          permission or not to do that.  But what I'm
 5          saying to bolster my position that I had
 6          authorization to do that is that as soon as I
 7          found out about it and there was demand for
 8          it, that that money was paid in full.
 9               And this criminal statute, which is
10          pretty clear, states on there that the issue,
11          if you are making this charge under the
12          criminal statute and that the money is repaid,
13          then there is no theft.  It can't be repaid
14          months later.  But we are talking about three
15          days later.
16               And it really wasn't a formal demand.
17          But once I found out that there was any
18          question about it even though I couldn't talk
19          to Ms. Fauntleroy, that that money was
20          returned to her per our agreement.
21               MS. McBRIDE:  What is your position on
22          that?
23               MR. WHITE:  I think we are getting into
24          the weeds here.  The question was about bills,
```


MAGNA
LEGAL SERVICES

Page 64

```
 1        I don't understand how the bills are relevant.
 2        The Petition for Discipline alleged that Mr.
 3        Conner converted Ms. Fauntleroy's funds
 4        through transactions at casinos which he
 5        stipulated to.  Whether or not she received
 6        bills and whether or not Mr. Conner paid them
 7        doesn't appear to be relevant of that.
 8             MR. CONNER:  And what I'm saying for
 9        purposes of the record, the record needs to
10        establish how much money was under my control
11        during this period of time and what came into
12        the account.  It also needs to establish what
13        bills were paid so we can determine what
14        amount of money Ms. Fauntleroy was entitled
15        to.
16             MS. McBRIDE:  But you stipulated to the
17        amounts of the withdrawals, correct?
18             MR. CONNER:  Correct.
19             MS. McBRIDE:  There is a stipulation as
20        to the amount that was repaid, correct?
21             MR. CONNER:  Correct.
22             MS. McBRIDE:  So then why do her bills
23        matter?
24             MR. CONNER:  Her bills matter because
```



Page 65

```
 1        again, she is saying she didn't understand how
 2        she has so much money.  But she has so much
 3        money because I was paying those bills, paying
 4        back that amount of money per our agreement by
 5        making deposits into the account.
 6            MS. McBRIDE:  Why does that matter if at
 7        the end of the day we know what numbers are?
 8        We know what was withdrawn and we know what
 9        you paid back.  So why does it matter what
10        bills were paid in the interim?
11            MR. CONNER:  You have to establish how
12        much money was due Ms. Fauntleroy.
13            MS. McBRIDE:  You stipulated to the
14        amounts.
15            MR. KRAWITZ:  You stipulated to the
16        amount you paid back.  You stipulated to the
17        amount of money.  We wouldn't know.  You
18        stipulated to it.
19            MR. CONNER:  No.  No, I didn't stipulate
20        to the amount of money.  You mean the $67,000.
21            MS. McBRIDE:  You stipulated to the
22        withdrawals, correct?
23            MR. CONNER:  Yes.
24            MS. McBRIDE:  And you stipulated to the
```



Page 66

1      amount you repaid, correct?

2           MR. CONNER:  No.

3           MR. WHITE:  If I could clear up.  We did

4      stipulate ODC-1 in Paragraph 12B, we

5      stipulated that he provided the certified

6      check in the amount of $67,708.15.

7           MR. KRAWITZ:  Right.

8           MR. WHITE:  I think there may be an issue

9      later in the proceeding whether more funds

10     were paid or not.  But that's what the

11     stipulation says.

12          MR. CONNER:  Maybe I'm not being clear.

13     The stipulations are that I used Ms.

14     Fauntleroy's card to do transactions at the

15     casino, both transactions directly and ATM

16     cards.  That's the transaction.  And that

17     amount of money comes to close to $100,000.

18          What I'm saying is that that cumulative

19     amount of money wasn't all of Ms. Fauntleroy's

20     money.  There was money that I was, when I

21     would go to the casino to use her card, I was

22     paying money, depositing money back into her

23     account.  So it was not $100,000.

24          My stipulation is that I used the card.



Page 67

```
 1        My stipulation is not that I took $100,000 of
 2    Ms. Fauntleroy's money and used it, because I
 3    did not.  She didn't have that money.  As I
 4    used the card, I was making deposits into her
 5    account.  Then I would use the card again.  So
 6    I wasn't using $100,000 of Ms. Fauntleroy's
 7    money.  I did not stipulate to that.  I did
 8    stipulate, though, that I used the card.
 9            So again, my position is that we need to
10    know how much money Ms. Fauntleroy actually
11    had.  We need to know that through the pension
12    and through the investment.  And then we need
13    to know how much of that money was used for
14    her benefit which is what I'm asking her about
15    right now because that gets you to what was
16    actually owed.  You can't look at the $100,000
17    because I'm making deposits over 23 deposits
18    into her account.  It wasn't $100,000 of her
19    money.  She didn't have that money.
20            MR. SAILLE:  Mr. Conner, are you saying
21    that you are commingling your own money with
22    her money?
23            MR. CONNER:  No.  I'm saying that
24    Fauntleroy gave me permission.  It was almost
```



Page 68

```
 1      like a loan.  It was almost like she said, Hey
 2      look, can I use your card while I'm at the
 3      casino?  Yes, you can.  Ms. Fauntleroy, I will
 4      put that money back into your account.  Okay,
 5      fine.  You can see how much I'm using every
 6      month because you are getting bank statements
 7      on that.
 8          As I was using that money, I was making
 9      deposits back into that account.  That's how
10      that amount goes up.  It wasn't $100,000 worth
11      of her money.  I would use it, I would repay
12      it according to our agreement.
13          That's why it's important to know I
14      couldn't have used $100,000.  She didn't have
15      it.  That's money that I -- I wasn't
16      commingling.  I wasn't taking my money and
17      commingling my money with hers.  It was based
18      on our agreement.
19          That's why it's important, it's important
20      to understand that I could not have taken
21      money that she didn't have.  And I'm trying to
22      explain to the Board how, why it is that I'm
23      making that assertion and establishing what
24      she had, what was spent on her behalf and was
```



Page 69

1        returned to her is the actual money we are

2        talking about now.

3             So that stipulation isn't a stipulation

4        that I took $100,000 of her money.  That's why

5        the deposits are important because she didn't

6        have that money.

7             MR. SAILLE:  Is this agreement you

8        proposed something that was done orally or is

9        it something in writing?

10            MR. CONNER:  It was done orally, but it

11       wasn't just on one occasion.  As the person

12       that was writing the checks, and I'll get into

13       this testimony before, I didn't write any

14       checks or do any transactions on that account

15       without Ms. Fauntleroy's authorization to do

16       it.

17            And the use of the card at the casino was

18       part of that.  We talked lots of times about

19       that.  And it's clear it wasn't like I hid

20       anything from her.  It was right there and we

21       talked about it.  She may not remember that

22       now.  That's up to the Panel to decide whether

23       or not she did that.

24            But the bottom line is I didn't steal any



Page 70

1       money from her.  I'm saying I wouldn't have

2       done it without her authorization.  And all of

3       the money was paid back to her that she was

4       entitled to.

5            So I would like the record to reflect the

6       type of expenses that she had that I paid on

7       her behalf out of her money.

8            MR. KRAWITZ:  We are going to take a few

9       minute recesses and discuss this further.  We

10      stand adjourned.

11           (Whereupon, a break was taken off the

12      record.)

13           MR. KRAWITZ:  The Panel has discussed the

14      objection and taking into consideration the

15      arguments, Mr. Conner, we are going to allow

16      in a limited fashion some questions about the

17      expenses.

18           I would encourage you, though, before you

19      launch into that, encourage you to think about

20      maybe working out some form of stipulation

21      about the expenses with the Office of

22      Disciplinary Counsel.

23           MR. CONNER:  While you guys were outside,

24      I was thinking about that.  I have marked as



Page 71

1    RS-5, an amended summary of receipts and

2    disbursements.  I would ask Disciplinary

3    Counsel to take a look at it.  And if there

4    can be a stipulation to the contents of that.

5    That breaks down all of the expenses and there

6    will be no reason to go through it and make it

7    part of the record.

8        MR. WHITE:  I'm unwilling to stipulate to

9    the figures in RS-5.  I will stipulate to the

10   admission of RS-5.  It appears Ms. Fauntleroy

11   is running out of gas.  The document shows

12   what they show and Mr. Conner can establish

13   this on cross if he'd like.  But I'll

14   stipulate to the admission of RS-5, not to its

15   contents.  I have a lot of questions about the

16   figures that I intend to ask Mr. Conner on

17   cross.

18       MR. KRAWITZ:  Mr. Conner, do you have a

19   response?

20       MR. CONNER:  I think that will be fine.

21   Yeah.

22       MR. KRAWITZ:  Okay.

23       MR. CONNER:  So I would like to introduce

24   and move for admission RS-5.



1          MR. WHITE:  No objection.

2          MR. KRAWITZ:  With that, Mr. Conner, do

3      you have, do you need to ask some limited

4      number of questions on this issue?

5          MR. CONNER:  I think I'm about done.  I

6      beg the Panel's indulgence for just a minute.

7          MR. KRAWITZ:  Sure.  Okay.

8          Mr. Conner.

9          MR. CONNER:  Yes.

10          MR. KRAWITZ:  The dates, just talking

11      about the dates now, and if you need this back

12      to look at this.  I'm thinking particularly in

13      the ending balance date, shouldn't that be

14      '17?

15          MR. CONNER:  Let me pull out my copy.

16          MR. KRAWITZ:  Do you need this back?

17          MR. CONNER:  No, I have another copy.

18      Just a second.  We'll look at it together.  It

19      should be '17.  I'm sorry.

20          MR. KRAWITZ:  Can you go through and just

21      tell us the dates, confirm the dates?  It

22      should be at the top, it should say April

23      27th, 2017.  Why don't you take this back and

24      you make the changes on it and correct the



Page 73

1      date and then you will resubmit it.

2          MR. CONNER:  Yeah, I'm sorry.  I see

3      another problem.  Yeah.  Let me do that.  I'm

4      sorry.

5          MR. KRAWITZ:  I believe the testimony,

6      your questions were also, now that we are

7      looking at the dates, your questions said '16

8      and I think you were referring to '17

9      particularly in the April date.

10         MR. CONNER:  The April date is always

11     2017.

12         MR. KRAWITZ:  I think the transcript is

13     going to reflect that that says '16.  We may

14     need to --

15         MR. WHITE:  That's prior to the date of

16     the Power of Attorney.

17         MR. KRAWITZ:  Right.  So that may need to

18     be --

19         MR. CONNER:  Maybe that was confusing for

20     the Panel as well.  I'm sorry.  Yeah.  Any

21     date --

22         MR. KRAWITZ:  Mr. Saille picked up on not

23     only did we see this on the document, but his

24     recollection is your questions were using



Page 74

1          April of '16.  Am I correct?

2               MR. SAILLE:  Yes, that's correct.  I

3          remember.

4               MR. KRAWITZ:  April '17, I suggest we'll

5          deal with that once there is a transcript

6          post-hearing.  We may need to do some type of

7          errata, agreed-upon errata sheet or something

8          to correct those dates in the transcript.

9               MR. WHITE:  Very well.

10              MR. KRAWITZ:  Is that fair?

11              MR. WHITE:  It's okay with the Office of

12         Disciplinary Counsel.

13              MR. KRAWITZ:  Is that okay with you, Mr.

14         Conner?

15              MR. CONNER:  It is, and I apologize.

16              MR. KRAWITZ:  The Panel, the feeling is

17         that the questions should probably be asked

18         with the correct dates to make the record

19         clear.

20              MR. SAILLE:  Ms. Fauntleroy can answer

21         them correctly.  Because if we agreed upon it

22         later, it's not her answer.

23              MR. KRAWITZ:  I would suggest that

24         counsel could agree, we have searched the



Page 75

```
 1        record.  And we have determined that the

 2        reference to April, 2016 which should have

 3        been April, 2017 was during the argument on

 4        the last objection regarding RS-5.  Given that

 5        it was during the argument of counsel, I would

 6        say that once the transcript is available,

 7        that counsel agree to execute an errata sheet

 8        to correct that for the transcript.  Is that

 9        fair?

10             MR. WHITE:  That's okay with the Office

11        of Disciplinary Counsel.

12             MR. CONNER:  Proceed?

13             MR. KRAWITZ:  Sure.

14   BY MR. CONNER:

15        Q    Ms. Fauntleroy, I want to, for the

16   record, between August 1st, 2016 through April

17   27th, 2017, you lived at 1634 North 30th Street in

18   Philadelphia, correct?

19        A    Correct.

20        Q    You received a monthly bank statement

21   from your Wells Fargo checking account each month

22   between August 1st, 2016 through July 27th of

23   2017, correct?

24        A    Yes.
```



Page 76

1          MR. CONNER:  And I would like to, instead

2     of showing her each one, we are going to use

3     -- Disciplinary Counsel's marked exhibits

4     would be ODC 3A through 3J.  There has been a

5     stipulation that they would be admitted.

6          MS. McBRIDE:  Can we see a copy?

7          MR. WHITE:  Are you moving their

8     admission, Mr. Conner?

9          MR. CONNER:  I'm moving their admission.

10    And again, ODC-3A through 3J would be the

11    Wells Fargo checking account statements that

12    went to Ms. Fauntleroy's address at 1634 North

13    30th Street.

14         MR. WHITE:  I do have copies for the

15    Panel as well.

16         MR. CONNER:  I don't have any additional

17    questions for Ms. Fauntleroy.  However, I

18    would like to move for admission of RS-5, the

19    stipulations that were placed on the record.

20         MR. KRAWITZ:  You have handed us RS-5.

21         MR. CONNER:  RS-5, right.  So the

22    admission of that document.

23         MR. KRAWITZ:  Okay.

24         MR. CONNER:  Also the admission of RS-6A.



Page 77

1         MR. KRAWITZ:  6A?

2         MR. CONNER:  Yeah.  That was the check.

3         MR. KRAWITZ:  We have an RS-6 that you

4     referred to.  There was an objection to that.

5         MR. WHITE:  RS-6 is identical to ODC-3A.

6     So we instead moved ODC-3A into evidence.

7         MR. KRAWITZ:  Okay.

8         MR. CONNER:  RS-6A were the checks.

9         MR. WHITE:  I'd stipulate to the

10    admission of 6A as well.

11        MR. CONNER:  6A and also RS-11A.

12        MR. WHITE:  I'll stipulate to 11A.

13        MR. CONNER:  And the purpose of those

14    two, RS-6A, they contain eight checks written

15    off of the Wells Fargo Bank accounts dated

16    August 6th, 2016 signed by Sarah Fauntleroy.

17    And RS-11A would include one check dated

18    December 21st, 2016, Check Number 4297 written

19    and signed by Ms. Fauntleroy.

20        MR. KRAWITZ:  Any objection?

21        MR. WHITE:  No objection to 6A or 11A.

22    If I could just circle back to RS-5.  I

23    previously stipulated to its admission but I

24    understand that Mr. Conner has since made



Page 78

 1     handwritten alterations to that document.

 2          MR. KRAWITZ:  He has.

 3          MR. WHITE:  Could I see what the changes

 4     were?

 5          MR. KRAWITZ:  Sure.  I thought he handed

 6     you a copy.

 7          MR. CONNER:  I'm sorry.  I did not.

 8          MR. WHITE:  Thank you.

 9          MR. KRAWITZ:  Sure.

10          MR. WHITE:  I have no objection to the

11     altered document.

12          MR. KRAWITZ:  Mr. Conner, are you

13     complete with your cross?

14          MR. CONNER:  I am.

15          MR. KRAWITZ:  Any redirect?

16          MR. WHITE:  Just briefly.

17          MR. KRAWITZ:  Sure.

18   BY MR. WHITE:

19     Q    Ms. Fauntleroy, Mr. Conner asked you, and

20   I think you confirmed, that you initially hired

21   Mr. Conner because you were running out of money.

22   Is that correct?

23     A    Well, not because I was running out of

24   money, but I did not have anybody to oversee it.



Page 79

1    So that was when I talked to my brother about

2    having somebody responsible.

3        Q    But around the time in late July of 2016

4    when you hired Mr. Conner to be your Power of

5    Attorney, did you testify on cross-examination

6    that you were running out of money at that time?

7        A    I must have because that's the only

8    reason I would need somebody is because the

9    caretakers were not being paid.  That was the most

10   important thing.

11       Q    Now, if you were running out of money,

12   would you have told Mr. Conner or anyone else that

13   they could spend money from your account at a

14   casino?

15       A    No.

16       Q    Now, you also testified on

17   cross-examination, I believe, that Mr. Conner had

18   performed some legal services for you.  He

19   prepared a will and a Healthcare Power of

20   Attorney.  Is that correct?

21       A    He did what?

22       Q    I believe he prepared a will for you and

23   a Healthcare Power of Attorney.  Is that correct?

24       A    Yes.



Page 80

 1          MR. CONNER:  I'm going to object.  I

 2     thought there was an objection that was

 3     sustained by the Panel when I wanted to move

 4     forward with cross-examination using those

 5     documents.

 6          MS. McBRIDE:  I think that the objection

 7     was to the admission of those documents into

 8     the record, not questions about them.

 9          MR. CONNER:  Well, no.  The objection was

10     I was getting ready to cross-examine her using

11     those documents.  I hadn't gotten to asking

12     for them to be admitted.  I wanted to ask her

13     questions on those documents.  There was an

14     objection and it was sustained by the Panel.

15          MR. WHITE:  I'll withdraw the question.

16          I have nothing further.

17          MR. KRAWITZ:  Recross?

18          MR. CONNER:  Nothing.  Thank you.

19          MS. McBRIDE:  I have one question.

20          Ms. Fauntleroy, can you hear me?  Can you

21     hear me?

22          THE WITNESS:  Yes.

23          MS. McBRIDE:  I just had a question.  How

24     did you become aware?  How did you learn about



Page 81

1    withdrawals that were made from your account

2    or checks that were written to the casino?

3    How did you learn about that?

4        THE WITNESS:  When my caretaker advised

5    me that the checks, they were not being

6    covered.

7        MS. McBRIDE:  Did you say were not being

8    covered?

9        THE WITNESS:  Right.

10       MS. McBRIDE:  Were checks bouncing?

11       THE WITNESS:  I guess that's what you

12   call it when you go there and there is no

13   money.

14       MS. McBRIDE:  Did you report that to

15   anybody?

16       THE WITNESS:  Yes.  I asked them if that

17   was so, and they said yes.

18       MS. McBRIDE:  To whom did you report that

19   information?

20       THE WITNESS:  Well, to -- it had to be to

21   whoever was signing the checks and paying the

22   caretakers.  And the checks were bouncing.

23       MS. McBRIDE:  So did you call the police?

24       THE WITNESS:  No.



Page 82

1          MS. McBRIDE:  Did you call anybody to

2      report that information?

3          THE WITNESS:  Well, through my brother

4      and through the caretakers, that's all I did.

5          MS. McBRIDE:  Thank you.

6          MR. CONNER:  Can I follow-up on that line

7      of questioning?

8          MS. McBRIDE:  Sure.

9   BY MR. CONNER:

10     Q    Ms.  Fauntleroy, as far as any overdrafts

11  on the account, you spoke to me about that,

12  correct?

13     A    That the checks were not being paid?

14     Q    You said that there was an occasion that

15  you found out that a check wasn't being paid.  And

16  I think the question was, who did you talk to

17  about that?

18          And my question to you is, on that

19  occasion, you spoke to me about that, correct?

20     A    To you and my brother.

21     Q    Me and your brother?

22     A    Right.

23     Q    And as a result of that, as a result of

24  our conversation, you knew that that check had



Page 83

1    been made good and that's the reason why you

2    didn't go to the police or make any statements to

3    anybody about me stealing anything, correct?  You

4    talked to me about that, correct?

5        A    Yeah.

6        Q    And after you talked to me about that,

7    you didn't talk to anybody else about it, did you?

8        A    No.

9            MR. CONNER:  No further questions.

10           MR. KRAWITZ:  Okay.

11           MR. WHITE:  I have a couple.  I think I

12       might be able to illuminate this issue.

13           MR. KRAWITZ:  Okay.

14   BY MR. WHITE:

15       Q    Ms. Fauntleroy, after you revoked Mr.

16   Conner's Power of Attorney, did you go to the

17   Philadelphia Corporation for Aging?  Did you speak

18   with a woman named Tia Kelly?

19       A    Yes.

20       Q    And was Ms. Kelly going to help you pay

21   your bills?

22       A    Well, she was going to see what could be

23   done.  Yes.

24       Q    Did Ms. Kelly tell you anything about any



Page 84

```
 1   transactions at casinos at that time?

 2          MR. CONNER:  I'm going to object.  I

 3      don't know whether that is getting ready to

 4      get into hearsay.  Ms. Kelly is not here right

 5      now.  So I think that's where we are going

 6      with that.

 7          MR. KRAWITZ:  Sustained.

 8          MR. WHITE:  I have nothing further.  I

 9      would call Seth Maltzman.

10          MR. KRAWITZ:  Very well.

11          MR. WHITE:  Can Ms. Fauntleroy be

12      excused?

13          MR. KRAWITZ:  She can.

14          Thank you, Ms. Fauntleroy.

15          THE WITNESS:  You are quite welcome.

16                       ---

17          SETH MALTZMAN, ESQUIRE, after having been

18      first duly sworn, was examined and testified

19      as follows:

20                       ---

21                  EXAMINATION

22                       ---

23   BY MR. WHITE:

24      Q    Good morning, Mr. Maltzman.
```



Page 85

1     A     Good morning.

2     Q     Thank you for coming.  Mr. Maltzman, how

3  do you know Sarah Fauntleroy?

4     A     She came to me as a client.

5     Q     How many times have you met with Ms.

6  Fauntleroy?

7     A     Twice.

8     Q     I'm sorry.  If you could just direct your

9  answers to the Panel behind you.  It's a little

10  awkward.  I apologize.

11     A     Sure.  Sure.

12     Q     So you said Ms. Fauntleroy came twice?

13     A     Yes.

14     Q     Approximately when were those meetings?

15     A     In 2017.  I believe April 27th, 2017 and

16  then in November, 2017.

17     Q     Sir, I'm going to show you what I have

18  previously marked as ODC Exhibit 5.  Do you

19  recognize that document, sir?

20     A     Yes.

21     Q     Can you tell the Panel what that is?

22     A     It's a revocation of a Power of Attorney

23  that I prepared for Sarah Fauntleroy on April

24  27th, 2017.



Page 86

1          MR. WHITE:  I move for the admission of

2     ODC-5.

3          MR. KRAWITZ:  Any objections?

4          MR. CONNER:  No.

5          MR. WHITE:  Can I present copies to the

6     Panel?

7          MR. KRAWITZ:  Please.

8          MR. CONNER:  You know what, I'm going to

9     hold off on agreeing to that until he finishes

10     his testimony about that document.  I have

11     some questions about the document.  I'm sorry.

12 BY MR. WHITE:

13     Q    Mr. Maltzman, you prepared this document

14 I marked as ODC Exhibit 5?

15     A    Yes, sir.

16     Q    Is that a true and correct copy of the

17 document you prepared?

18     A    Yes, sir.

19     Q    Sir, I'm going to show you what I

20 previously marked as ODC Exhibit 6 and 7.  Have

21 you seen either of those documents before?

22     A    I'm looking at ODC-6 right now.  No, I

23 have never seen ODC-6 before.

24     Q    Okay.



Page 87

1      A     And I have never seen ODC-7 before.

2      Q     If I could direct your attention to

3   Paragraph 226 of ODC-6.

4      A     Yes.

5      Q     Could you please read that allegation?

6            MR. CONNER:  Paragraph 226?

7            MR. WHITE:  Correct.

8            THE WITNESS:  On April 27th, 2017, Ms.

9       Fauntleroy revoked the General Durable Power

10      of Attorney that she had executed in your

11      favor on July 29th, 2016.

12   BY MR. WHITE:

13      Q     If I could direct your attention to

14   Paragraph 226 of ODC-7.

15      A     Yes.

16      Q     Would you please read Mr. Conner's

17   response to that allegation aloud?

18      A     226, admitted in part, denied in part.

19   It is admitted that the General Durable Power of

20   Attorney that Ms. Fauntleroy executed on July

21   29th, 2016 was revoked on or about April 27th,

22   2017.

23           By way of further answer, Ms. Fauntleroy

24   was in poor health both physically and mentally at



Page 88

1   the time the POA was revoked.  And, therefore, it

2   is denied that she was capable of making a knowing

3   and intelligent decision to revoke the POA.

4          By way of still further answer,

5   Respondent was not notified that the POA was

6   revoked and that the account was closed until

7   Friday, April 28th, 2017.

8   Q    Based on your interactions with Ms.

9   Fauntleroy in April of 2017, do you believe that

10  she was capable of making knowing and intelligent

11  decisions?

12  A    Yes.

13  Q    I believe you testified you met with her

14  in November of 2017 as well?

15  A    Yes.

16  Q    At that time, did you believe that she

17  was capable of making knowing and intelligent

18  decisions?

19  A    Yes.

20  Q    What is your reaction to Mr. Conner's

21  allegation that Ms. Fauntleroy was in poor health

22  both physically and mentally such that she was

23  incapable of making a knowing and intelligent

24  decision in April of 2017?

