1      A    I disagree with that.  I met with her in

2    person.  She was in a wheelchair, but she was

3    completely mentally intact.  I had asked her a

4    series of questions, where she lived, where she

5    was, what was the date, what kind of assets did

6    she have?  And she answered all of those quietly

7    but, to my satisfaction, intelligently.

8      Q    Based on her answers to your questions,

9    you believe that she was capable of making knowing

10   and intelligent decisions at that time?

11     A    Absolutely.

12          MR. WHITE:  I have nothing further.

13   BY MR. CONNER:

14     Q    Mr. Maltzman, I'm going to direct your

15   attention to, I guess revocation of Power of

16   Attorney.  What's that, ODC --

17          MR. WHITE:  5.

18   BY MR. CONNER:

19     Q    ODC-5.  Do you have a copy of it in front

20   of you?

21     A    Yes, sir.

22     Q    First of all, I see it's signed or dated

23   April 27th of 2017.  Is that the date she came

24   into your office?



Page 90

1        A       I believe so.

2        Q       Did she actually sign this document in

3    front of you?

4        A       Yes.

5        Q       Who gave you the information that's

6    contained in the document?

7        A       She did.

8        Q       You said that you didn't see anything

9    wrong with her ability to answer your questions

10   and she seemed like everything was fine, correct?

11       A       Yes.

12       Q       You believed that what she was telling

13   you that you put in this document was true and

14   correct information, correct?

15       A       Yes.

16       Q       Would it surprise you if I told you that

17   on the first line of that Revocation of Attorney,

18   it says that the Power of Attorney was dated

19   August 5th, 2016 that, in fact, it was dated July

20   29th, 2016?

21       A       Would it surprise me?

22       Q       Yes.  You said everything was fine.  She

23   knew exactly what she was doing.  She gave you

24   this information about the date of the Power of



Page 91

1    Attorney.  It's the wrong date.

2        A    I relied on her statement to me.

3        Q    You never looked at the Power of

4    Attorney?

5        A    I did not.  She did not have a copy of

6    the Power of Attorney.

7        Q    Well, if you would have looked at it and

8    you would have seen that it wasn't signed on

9    August 5th, 2016, it was signed on July 29, 2016,

10   do you think you may have asked some more

11   questions about whether or not she knew exactly

12   what she was doing at that time?

13       A    No.  I would have asked her, I asked her

14   for a copy of the Power of Attorney.  She didn't

15   have it.  She estimated the date.  There were two

16   other ladies with her and they confirmed the date

17   to the best of my knowledge.

18           MR. CONNER:  I'm going to object to that.

19       Okay.

20   BY MR. CONNER:

21       Q    Because you relied on Ms. Fauntleroy?

22           MR. KRAWITZ:  What is your objection?

23           MR. CONNER:  My objection is he's talking

24       about hearsay, about what other people told



Page 92

1     him during that meeting.

2          MS. McBRIDE:  I don't think he said that.

3          MR. KRAWITZ:  That's not what he said.

4          MR. CONNER:  Withdraw.

5          MR. KRAWITZ:  We can have the question

6     read back.

7  BY MR. CONNER:

8     Q    Go ahead.

9     A    So whatever date I would have put on that

10 document would have been based on my conversations

11 with Ms. Fauntleroy.

12    Q    You understand that this is a very

13 important document, correct?

14    A    Absolutely.

15    Q    And the Power of Attorney that you are

16 referring to is very important, correct?

17    A    Absolutely.

18    Q    And the dates that are on that document

19 are very important, correct?

20    A    Correct.

21         MR. CONNER:  I have no further questions.

22         MR. KRAWITZ:  Any redirect?

23         MR. WHITE:  No.

24         MS. McBRIDE:  I have a couple questions.



Page 93

1            Sir, are you a lawyer?

2            THE WITNESS:  Yes.

3            MS. McBRIDE:  Where do you practice?

4            THE WITNESS:  Montgomery County, Delaware

5       County and Philadelphia.

6            MS. McBRIDE:  What is the name of your

7       practice?

8            THE WITNESS:  The Law Office of Seth P.

9       Maltzman.

10           MS. McBRIDE:  What is the nature of your

11      practice?

12           THE WITNESS:  A lot of family law, about

13      60 percent family law.  Bankruptcy estates,

14      general practice.

15           MS. McBRIDE:  How did you become

16      acquainted with Ms.  Fauntleroy?

17           THE WITNESS:  I received a call from a

18      woman by the name, I believe it's Shelio

19      Thomas, an aid of Ms. Fauntleroy.  And they

20      asked for an appointment.

21           MS. McBRIDE:  When did you first hear

22      from the woman who called you?

23           THE WITNESS:  Probably within a week of

24      the meeting.



Page 94

```
 1          MS. McBRIDE:  The meeting was when?

 2          THE WITNESS:  The date I did the

 3     revocation was April 27th, 2017.  The meeting

 4     was at my office at 401 City Avenue, Bala

 5     Cynwyd, Pennsylvania.

 6          MS. McBRIDE:  That was the first meeting?

 7          THE WITNESS:  Yes.

 8          MS. McBRIDE:  Thank you.

 9          MR. KRAWITZ:  Any questions?

10          MR. SAILLE:  Nope.

11          MR. KRAWITZ:  I don't have any questions.

12          MR. WHITE:  Nothing further.

13          MR. CONNER:  I don't have any objections

14     to the admission of this. (Indicating)

15          MR. KRAWITZ: Okay.

16          So Mr. Maltzman, you are excused.  Thank

17     you, sir.

18          You were going to hand me copies of

19     ODC-5.

20          MR. WHITE:  Correct.

21          MR. KRAWITZ:  ODC-5, ODC-6 and ODC-7 are

22     admitted?

23          MR. CONNER:  Yes.

24          MR. WHITE:  Do you have copies of all of
```



Page 95

```
 1        those, Mr. Conner?
 2             MR. CONNER:  I do.
 3             MR. KRAWITZ:  Mr. White?
 4             MR. WHITE:  I don't have any more
 5        witnesses.  Can I just confirm that ODC
 6        Composite Exhibit 3 was moved into evidence?
 7        Do you remember, Mr. Conner?
 8             MS. McBRIDE:  That's the one you did
 9        instead of the one he was going to do?
10             MR. CONNER:  3A.
11             MR. KRAWITZ:  But then you said there is
12        3A through 3J.
13             MR. WHITE:  Correct.  So it's clear, I'd
14        like to move for the admission of ODC
15        Composite Exhibit 3 consisting of 3A to 3J.
16             MR. KRAWITZ:  Any objection?
17             MR. CONNER:  No.
18             MR. WHITE:  Office of Disciplinary
19        Counsel rests.
20             MR. CONNER:  I just wanted to go back and
21        make sure I asked for the admission of RS-1
22        which was the Power of Attorney.
23             MR. KRAWITZ:  Right.  We have that and it
24        was admitted.
```



1       MR. WHITE:   Correct.   That's my

2   recollection.

3       MR. KRAWITZ:   Mr. Conner, are you ready

4   to proceed?

5       MR. CONNER:   I am.   But before I do that,

6   for the record, I'm asking for I guess what

7   would be the equivalent of a directed verdict.

8   And I'd like to make my argument at this point

9   in time as to why.

10      MR. WHITE:   I'm not aware of any directed

11  verdict provided for in the Rules Of

12  Disciplinary Enforcement.

13      MR. KRAWITZ:   Neither am I.   Give me a

14  moment.

15      (Whereupon, a discussion was held off the

16  record.)

17      MR. KRAWITZ:   Mr. Conner, do you have

18  some authority that you would like to provide

19  to us that you could make such a motion at

20  this time in a hearing for discipline?

21      MR. CONNER:   I don't have any case law.

22  I'm just going on the fact that we are in a

23  proceeding now in which Disciplinary Counsel

24  has the burden of moving forward with their



Page 97

1      allegations against me.  I am prepared to

2      testify in this matter.

3          But my position, I guess, has been

4      stated.  I'd like to restate it again.  The

5      basis of this complaint, I don't think that

6      there has been --

7          MR. KRAWITZ:  Before you start stating

8      the basis for any position.  You have asked to

9      basically make a motion for a directed

10     verdict.

11         MR. CONNER:  Correct.

12         MR. KRAWITZ:  There is no, that I'm aware

13     of or any member of this panel is aware of, of

14     such a provision in the rules that guide us

15     here today.

16         I'm asking if you have such authority,

17     can you cite it to me?

18         MR. CONNER:  I do not.

19         MR. KRAWITZ:  Okay.  Then under the

20     procedures and the rules, you need to proceed

21     with your case.  Are you ready?

22         MR. CONNER:  I am.

23         MR. KRAWITZ:  Okay.  Then I ask that you

24     proceed.



1          MR. CONNER:  Do you want me to come up

2     there or is it okay to sit here?

3          MR. KRAWITZ:  Can you give us an idea how

4     many witnesses you have?

5          MR. CONNER:  Just me.

6          MR. KRAWITZ:  Just you?

7          MR. CONNER:  Yes.

8          MR. KRAWITZ:  How long do you think that

9     is going to go?

10          MR. CONNER:  Not long.  I think a lot of

11     what I have to say -- it depends on

12     cross-examination, but I don't have much.

13          MR. KRAWITZ:  All right.  Please proceed.

14                    ---

15          JOHN CONNER, ESQUIRE, after having been

16     first duly sworn, was examined and testified

17     as follows:

18                    ---

19          MR. KRAWITZ:  Mr. White, you are

20     okay with him staying there?

21          MR. WHITE:  Yes.

22          MR. CONNER:  In March of 2016, I

23     received a phone call from Lorenzo Fauntleroy.

24     Mr. Fauntleroy is a client of mine.  He



Page 99

```
 1        indicated to me that he had a --
 2             MR. WHITE:  Objection.  This is hearsay.
 3             MR. KRAWITZ:  Sustained.
 4             MR. CONNER:  In March of 2016, I went to
 5        1634 30th Street -- North 30th Street in
 6        Philadelphia with Lorenzo Fauntleroy to meet
 7        with Ms. Sarah Fauntleroy.  Mr. Lorenzo
 8        Fauntleroy was a client of mine and the
 9        brother of Ms. Sarah Fauntleroy.
10             When we got to Ms. Fauntleroy's
11        residence, she explained to me that she wanted
12        --
13             MR. WHITE:  Objection.  Hearsay.
14             MR. CONNER:  I'm testifying as to what
15        Ms. Fauntleroy told me.  She is the
16        Complainant.
17             MR. KRAWITZ:  Sustained.
18             MR. CONNER:  Ms. Fauntleroy is the
19        Complainant.  And I can't testify what our
20        conversations was?
21             MR. KRAWITZ:  You could have questioned
22        her.  She was a witness here.  She was here to
23        be questioned about anything you wanted to
24        question her about.
```



Page 100

1           MR. CONNER:  Yes.  And I want to refute

2       what she told me.  And if I can't testify to

3       what she told me and what my response was, how

4       do I that?

5           MR. KRAWITZ:  She was a witness.  You had

6       the opportunity to question her about anything

7       you wanted to question her about.

8           MR. CONNER:  I did.  But my testimony is

9       in disagreement to what she said.

10          MR. KRAWITZ:  So then you can tell us

11      what you are going to -- you are testifying

12      now.

13          MR. CONNER:  Okay.

14          MR. KRAWITZ:  Mr. Conner, to the extent

15      you are going to testify to something, to use

16      your words, to contradict something that Ms. S

17      Fauntleroy testified about either on direct or

18      cross, you can testify about it.  That is

19      fine.

20          You cannot testify as to something she

21      told you that you didn't ask her about or that

22      she didn't testify about on either direct or

23      cross.  To the extent you are going to testify

24      now to contradict something that Ms.



Page 101

1          Fauntleroy said here today, we'll allow it.

2          But we are not going to -- it would otherwise

3          be hearsay to let you talk about things that

4          were not the subject of testimony here.  Do

5          you understand?

6               MR. CONNER:  I understand that, sir.

7               MR. KRAWITZ:  Okay.

8               MR. CONNER:  When I arrived at Ms.

9          Fauntleroy's house, she asked me to assist her

10         with her finances.  At that time, I asked her

11         to provide me with any financial documents

12         that she had which would have included bank

13         statements, information regarding income that

14         she was receiving, information regarding

15         anyone that had access to her finances.  Any

16         personal information about her bills so that I

17         could review them to try to give her some

18         indications as to what was going on with her

19         finances.

20               In response to that, Ms. Fauntleroy gave

21         me a voluminous amount of information.  There

22         were bank statements, payment statements for

23         caretakers that she had retained to work with

24         her, how much those caretakers had been paid.



```
 1      Documents relating to their receipt of those
 2      monies, how many hours they had worked, who
 3      the caretakers were and that type of
 4      information.  But anyway, it was voluminous.
 5          Ms. Fauntleroy and I discussed my fee for
 6      legal services.
 7          MR. WHITE:  Objection.  She didn't
 8      testify to that.  It's hearsay.
 9          MR. KRAWITZ:  Sustained.
10          MR. CONNER:  Ms. Fauntleroy agreed to pay
11      me $250 an hour for legal services that I was
12      providing for her.
13          Ms. Fauntleroy didn't have any money at
14      the time, so I agreed to work for her until I
15      was able to figure out what her finances were.
16      And at that time, she would pay me for my
17      services.
18          When I began to look into what was going
19      on with her finances, it appeared that she had
20      had an individual named Homer Hills who she
21      had assigned as her POA.  Again, this is going
22      back to March of 2016.  And then Mr. Hills had
23      been the one responsible for helping her with
24      the payment of her bills.
```



MAGNA
LEGAL SERVICES

Page 103

1        It also appeared that her head caretaker,

2    Shelio Thomas, had also been a person that had

3    been instrumental in hiring her caretakers,

4    negotiating salaries for them, keeping track

5    of their hours and reporting to Mr. Hills what

6    they should be paid.

7        When I tried to put together a clear

8    analysis of what was going on, I was unable to

9    do so because Mr. Hills did not have

10   sufficient documents nor did Ms. Thomas have

11   sufficient documents.

12       At that time, Ms. Fauntleroy was dealing

13   primarily with two banks, Wells Fargo Bank and

14   Citizens Bank.

15       Over a period between March, April, May,

16   June and July of 2016, I went to Citizens Bank

17   and I reviewed documents that I had gotten

18   from Homer Hills regarding the Wells Fargo

19   account.  And again, I put in a lot of hours

20   in trying to determine what was going on.

21       The end result was that the records were

22   poorly kept.  There was no way for me to go

23   back to Ms. Fauntleroy and tell her exactly

24   what had happened with her finances because



Page 104

1       the records weren't there to establish that.

2           MR. WHITE:  I'm going to object.  None of

3       this is relevant.  Again, the Petition for

4       Discipline alleges that Mr. Conner stole

5       $100,000 -- or $80,000 from Ms. Fauntleroy.

6           MR. KRAWITZ:  We are going to overrule

7       the objection.  But Mr. Conner, I think it's

8       relevant to the fee that ultimately is

9       stipulated to which I believe is $9500, at

10      least as we understand was the fee.

11          So we think what you are testifying to is

12      relevant to your fee or to what you were paid.

13          MR. WHITE:  I just want to clear the

14      record.  There is no stipulation as to $9500

15      salary.

16          MR. SAILLE:  The stipulation is that he

17      paid himself a salary of $9500.

18          MR. WHITE:  I apologize.  That he paid

19      it, correct.

20          MR. KRAWITZ:  Let me see 13.  There is a

21      stipulation that he paid himself a salary of

22      $9500.

23          MR. WHITE:  Correct.

24          MR. CONNER:  Just in response to that.



1    There was testimony, my recollection there was

2    testimony from Ms. Fauntleroy that I also was

3    paid $10,000.  And that that was the check

4    that her brother, Lorenzo Fauntleroy, gave to

5    me and that I didn't take and gave back to

6    her.  So the part of what --

7        MR. WHITE:  I don't believe that was her

8    testimony, that Mr. Conner was paid $10,000.

9    I think you asked her if you deposited the

10   $10,000 into her account.

11       MR. KRAWITZ:  I think she said yes.

12       MR. WHITE:  She said yes.

13       MR. CONNER:  And I asked her -- and she

14   said that.  And I asked her specifically if

15   that was payment that her brother gave -- she

16   had indicated her brother had given, loaned me

17   the money to pay her bills.  And she initially

18   said just to pay her bills.  And I

19   specifically asked her my bills, and she said

20   yes.  That's my recollection.

21       MR. KRAWITZ:  Yes, she did.

22       MR. CONNER:  That's part of what I'm

23   doing.  I'm going to move along because I'm

24   almost where I need to be right now.



Page 106

```
1            MR. KRAWITZ:  Okay.

2            MR. CONNER:  So anyway, I concluded

3       sometime probably near the end of July, that I

4       wasn't able to actually put together exactly

5       where her money had gone because I was unable

6       to get sufficient information from Mr. Hills

7       or from Ms. Thomas.

8            Right around that time, Ms. Fauntleroy

9       contacted me and I determined that she was out

10      of money.  That her bank accounts said there

11      was a negative $771, I believe and 36 cents in

12      her account.

13           And based on that, I went back to her

14      residence.  And I explained to Ms. Fauntleroy

15      that she needed to make some changes in what

16      was going on with her account because she

17      wasn't going to be able to live at her home

18      unless she had money to take care of her

19      caretakers and she needed them 24 hours a day.

20           I told her that in my review of her

21      financial documents, I came across an

22      investment account that she had.  I told her

23      that I would try to get additional information

24      on it.  And if she wanted me to, I would try
```



Page 107

```
 1       to get that investment account liquidated so
 2       that she would continue to have money to live
 3       and to pay her caretakers.
 4           At that time, when I started looking into
 5       it, I could not get any information.  I think
 6       it was Delaware Trust, if I recall, that had
 7       the investment because they needed a Power of
 8       Attorney.  I went back to Ms. Fauntleroy and I
 9       explained to her, Look, you need to prepare
10       directives.  You need to get a Power of
11       Attorney, somebody to act on your behalf,
12       somebody other than Homer Hills.  You need to
13       get a Power of Attorney for healthcare in case
14       you get hurt and you are unable to make
15       decisions and you also need to have a will
16       prepared.  She agreed, again, to have me
17       prepare those documents for her.
18           When it came to the Power of Attorney,
19       Ms. Fauntleroy and I came to the conclusion
20       that I would be her Power of Attorney if, in
21       fact, a situation came up where she could not
22       make financial decisions on her own, that I
23       would then be able to make them for her.
24           The situation that was before us at the
```



Page 108

```
 1      time, was the investment at that time Delaware

 2      Trust Company.  They needed me to provide them

 3      with a Power of Attorney so that I could

 4      transact that business, liquidate the

 5      investment and place that investment into a

 6      savings account at Wells Fargo so that Ms.

 7      Fauntleroy could use that money to live off

 8      of.

 9          I did that.  I submitted that POA to

10      them, Delaware Trust.  They, in turn,

11      transacted the business and we were able to

12      liquidate that account.

13          While that was going on, and this was

14      going into now August, Ms. Fauntleroy

15      continued to make decisions on her account.

16      All of her checking accounts were going

17      directly to her.

18          There came a point early in August of

19      2016, where Ms. Fauntleroy said, I'm having --

20      she indicated that she was having trouble

21      writing out her checks and asked me if I would

22      add my name to her account.

23          MR. WHITE:  Objection.  This is hearsay.

24      She didn't testify to this.
```



Page 109

1          MR. KRAWITZ:   Sustained.

2          MR. CONNER:   The early part of August, I

3     went to Wells Fargo Bank and I got

4     authorization from Wells Fargo Bank to write

5     her checks for her caretakers.  At that time,

6     they gave me a card.  And the card that they

7     gave me was a debit card.  The debit card

8     would also allow me to pay bills for Ms.

9     Fauntleroy if and when she couldn't pay them

10    or when she gave me the directions or

11    instructions to pay her bills.

12          So although I had a POA, it was limited

13    to me writing her checks for her employees.

14    Now, the checks that were written for her

15    employees, first of all, I didn't hire her

16    employees.  She made, she hired her employees.

17    I did not set the rates for what they were

18    going to be paid and I did not say when they

19    were going to be paid.

20          Each week, I would get from Ms.

21    Fauntleroy a list of who had worked for her,

22    how many hours they had worked for her and

23    what they were entitled to be paid.  And I, in

24    turn, would write those checks for Ms.



Page 110

1      Fauntleroy.

2          I traveled from my Jenkintown office to

3      Ms. Fauntleroy's home almost every week making

4      sure that those caretakers were paid and that

5      they were paid on time.

6          In addition to that, Ms. Fauntleroy

7      called me on a number of occasions and told me

8      that --

9          MR. WHITE:  Objection.  Hearsay.

10         MR. CONNER:  In addition to that --

11         MR. KRAWITZ:  Sustained.

12         MR. CONNER:  In addition to that, I was

13     contacted by several different utility

14     companies, be it the electric company, oil

15     company who indicated they have been referred

16     to me --

17         MR. WHITE:  Objection.  Hearsay.

18         MR. KRAWITZ:  Sustained.

19         MR. CONNER:  I made payments when asked

20     to do so on behalf of Ms. Fauntleroy.  Those

21     payments are set forth in RS, I believe it's

22     5.

23         MR. KRAWITZ:  5?

24         MR. CONNER:  RS-5, those payments.



1          I never transacted any business on Ms.

2     Fauntleroy's checking account without her

3     permission to do so.

4          In August, shortly after she gave me

5     authority to write her checks, I asked her for

6     permission to use her card.  And based on our

7     conversation, she agreed to allow me to do

8     that only for when I was at the casinos.

9     That's the only time.  And there was no

10    agreement from Ms. Fauntleroy to give me any

11    money.  She never agreed to give me any money.

12         And the reason that Ms. Fauntleroy and I

13    were able to come to that type of personal

14    agreement is that when I became her Power of

15    Attorney back in July, on July 29th of 2016,

16    she had no money to pay me or she had no money

17    to pay her caretakers.

18         Her brother, Lorenzo Fauntleroy, wrote me

19    a check to deposit in her account because he

20    asked me how I was being paid.  I took that

21    check and I told Ms. Fauntleroy, Use that

22    check to pay your employees.  Because she had

23    no money at that time.  She didn't have enough

24    money.  She was in the hole money and she



1       didn't have money to pay.  I gave her that

2       money or allowed her to use that money to pay

3       her employees.

4            I began, again, to work for Ms.

5       Fauntleroy by paying her employees every week,

6       as I described to you earlier, as well as any

7       bills that she brought to my attention.  I

8       never received a bill from any company

9       regarding Ms. Fauntleroy.  No bills actually

10      came to me.  I only became aware of bills that

11      were presented to me.  And when those bills

12      were presented to me, I paid them.  I paid

13      most of them with the card that I had been

14      given -- a debit card.  Those expenses are set

15      forth in Exhibit RS-5.

16           There did come occasions when I paid

17      money, cash money on some of those expenses.

18      And those cash payments would be -- I beg The

19      Court's indulgence.  A cash payment to Shelio

20      Thomas in the amount of $1120 which is

21      identified in the bank receipts -- the bank

22      statements, excuse me, that are marked, I

23      believe 3A through 3J.  And also I would like

24      to introduce as Exhibit RS-26 - - - --



Page 113

1        MS. McBRIDE:  Mr. Conner, can you tell

2    us, you were talking about a cash payment.

3    What exhibit is that reflected on?

4        MR. CONNER:  -- I'm going to pass up

5    RS-26.  I have that here now.

6        MR. WHITE:  I would object as to

7    relevant.  Cash payments to Ms. Thomas aren't

8    relevant.  The Petition for Discipline alleges

9    that Mr. Conner stole money from Ms.

10   Fauntleroy.

11       MR. KRAWITZ:  The objection is overruled.

12       Go ahead, Mr. Conner.

13       MR. CONNER:  RS-26, if I could pass it

14   up, is a handwritten receipt for cash money

15   that I paid Shelio Thomas.  I ask that be

16   admitted.

17       Additionally, cash payments that were

18   made by me on behalf of Ms. Fauntleroy would

19   include a $504 salary payment to Dana Fox and

20   $6800 cash payments to myself.  As Exhibit

21   RS-5 indicates, I took a total of $9500 in

22   salary for the legal services that I provided

23   for Ms. Fauntleroy.  Again, $6800 of that

24   would have been cash.  The others were checks



Page 114

1    that I had written that are set forth in the

2    bank statements.  The total amount of cash was

3    $8424 cash payments that I made on behalf of

4    Ms. Fauntleroy.

5        Other payments that I made were $2000 in

6    cash payments that I made over a period, to

7    Ms. Fauntleroy over a period from August 1st

8    through, up through April 27th.  Ms.

9    Fauntleroy asked me or I provided cash

10    payments to Ms. Fauntleroy which were used for

11    her to buy food, to buy clothing, to have

12    transportation back and forth to the

13    doctors and to get any other miscellaneous

14    items that she needed.

15        And again, those cash payments were made

16    during that period of time.  And again, that

17    would be August 1st of 2016 through April 27th

18    of 2017.

19        Other cash payment that I made was to

20    Petro Oil Company.  Petro Oil Company was a

21    company that I had retained after Ms.

22    Fauntleroy ran out of oil.  Petro is my own

23    personal oil delivery service.  And at that

24    time, I obtained permission from Ms.



Page 115

 1          Fauntleroy to use them to service her heater

 2          and to put oil in her tank because she had run

 3          out.  I did not put that account in Ms.

 4          Fauntleroy's name.  I kept it in my name.  And

 5          I paid Petro $1220.20 for services they

 6          provided in maintaining her heater and for

 7          delivering oil to her.

 8              And finally, in December, I think in the

 9          early part of January, I retained accountants

10          to provide I guess it's W-9s so that I could

11          report to the IRS salaries that I had paid to

12          the caretakers on behalf of Ms. Fauntleroy,

13          and that bill was $200.

14              So the total amount of the out-of-pocket

15          cash payments was $11,846.20.

16              Again, that's a breakdown of what is

17          shown in Exhibit RS-5 as a breakdown of

18          salaries and also other bills that were paid

19          by me on behalf of Ms. Fauntleroy.  And as set

20          forth in Exhibit RS-5, the total amount of

21          those disbursements were $78,384.37.

22              Now, Ms. Fauntleroy received a pension of

23          $2000 -- I beg the Court's indulgence.  There

24          is testimony to this -- $2800 some odd dollars

