Page 116

1    each month in her pension.  $2828.62.  She

2    received that either the 1st or the 3rd of

3    each month, between August 1st of 2016 all the

4    way through April 27th of 2017 she received

5    that pension payment.

6         Again, I cashed out a $12,000 -- excuse

7    me.  An investment in the amount of

8    $112,702.60 for an investment transfer that

9    was placed into a savings account for her.

10        Absent the pension money and the

11   investment transfer, Ms. Fauntleroy had no

12   other funds that were given to her during that

13   period of time.  And during that period of

14   time, the expenditures that I just went

15   through, be it the salaries which total

16   $58,297.50 and the other cash expenses which

17   altogether total $78,384.37 were expenses that

18   were paid by me on behalf of Ms. Fauntleroy.

19        Between August 1st of 2016 through April

20   21st of 2017, I made 23 cash deposits into Ms.

21   Fauntleroy's checking account at Wells Fargo.

22   The first check that was deposited into the

23   account was for $10,000.  And again, I

24   explained to you that that $10,000 was a check



1      that her brother had given to me for legal

2      services I had provided for Ms. Fauntleroy up

3      through, I guess it would have been from March

4      through August 5th of 2016 in the amount of

5      $10,000.

6          I did not cash that check or take any

7      money or write myself a check off of Ms.

8      Fauntleroy's account for any of that money

9      because she needed that money to pay her

10     caretakers.

11         In addition to that, I made another 22

12     cash deposits into Ms. Fauntleroy's checking

13     account.  And those cash deposits were made

14     all the way from -- I can read it off to you.

15     There was -- on December 28th, 2016, there was

16     a $2000 deposit.  That's reflected in the bank

17     account statements.  On December 30th of 2016,

18     there was a $1000 deposit made.  That was

19     reflected in the checking account bank

20     statements.  On January 5th of 2017, there was

21     $1500 deposited.  That's reflected in bank

22     statements.  On 1/13/17, there was a $500 cash

23     deposit made.  That's reflected in the bank

24     statements and also reflected in RS, what I



Page 118

1      have marked as RS-41, which is marked as

2      RS-41.

3            MR. WHITE:  I'm going to object to RS-41.

4      This is hearsay.

5            MS. McBRIDE:  What is it?

6            MR. KRAWITZ:  What is it?

7            MR. CONNER:  RS-41 through RS-57 --

8      through RS-58, excuse me, and RS-59 are Wells

9      Fargo transaction receipts for cash deposits

10     that were made to that account.

11           MR. KRAWITZ:  I thought you just said, so

12     I'm clear before I confer here, that the cash

13     deposits that you were talking about are

14     reflected on the bank statements that are part

15     of ODC 3A through 3J.

16           MR. WHITE:  Correct.

17           MR. KRAWITZ:  Do I have that right?

18           MR. CONNER:  You are correct.

19           MR. KRAWITZ:  Okay.

20           MR. CONNER:  Every transaction that I'm

21     talking about is in the bank statements, but

22     they are also, this is also supplemental proof

23     of it.

24           MR. WHITE:  Just for the record, I



Page 119

1    haven't seen RS-59.  I don't know what that

2    is.

3         MR. CONNER:  RS-59 is the last bank

4    statement.

5         MR. WHITE:  It's the same as ODC 3J?

6         MR. CONNER:  Yes.  I'm sorry.

7         MR. KRAWITZ:  So that resolves RS-59

8    since you have already, we have already moved

9    in and you have agreed to ODC 3J, right, Mr.

10   Conner?

11        MR. CONNER:  Right.  They are, they are

12   documented in the bank statements, but I also

13   have my personal Wells Fargo transaction

14   receipts to support it as well.

15        MR. WHITE:  The objection is hearsay.

16   The receipts were submitted for the truth of

17   the fact the deposit was made into the

18   account.  There is no custodian from Wells

19   Fargo here to establish these receipts are

20   kept in the normal course of business.

21        MR. KRAWITZ:  Mr. Conner --

22        MR. CONNER:  Yes.

23        MR. KRAWITZ:  -- would you provide the

24   Panel with your thoughts on what exception to



1       the hearsay rule would apply to the -- let me

2       get this right, it's RS-41 through RS-58?

3            MR. WHITE:  Correct.

4            MR. CONNER:  These are documents that I

5       personally deposited into the account.  They

6       are my documents, my receipts that I received

7       from the bank.  They are not receipts that I

8       got from the bank but receipts that I got

9       personally from the bank.  I'm testifying, I'm

10      authenticating them because they are receipts,

11      they are my receipts that I got from the bank.

12           MR. WHITE:  That's not an objection to

13      the hearsay rule.  To the extent he is trying

14      to say that it's a statement by a party

15      opponent, it's not.  These are statements from

16      the bank, not Mr. Conner.

17           MR. KRAWITZ:  The receipts, RS-41 through

18      RS-58 you are saying are receipts from the

19      bank that you got?

20           MR. CONNER:  Correct, my receipts.  I

21      didn't go to the bank and get these from the

22      bank and come down here.  The bank gave these

23      to me as I was making my deposits.

24           MR. WHITE:  It's still hearsay.



Page 121

1         MR. KRAWITZ:  We are going to sustain the

2    objection.

3         MR. CONNER:  Just so the record

4    accurately reflects, I'm seeking to introduce

5    into evidence Exhibits RS-41 through RS-58

6    which are --

7         MR. WHITE:  Objection.

8         MR. CONNER:  -- Wells Fargo transaction

9    receipts for deposits that were made into Ms.

10   Fauntleroy, made by me into Ms. Fauntleroy's

11   checking account.

12        MR. KRAWITZ:  There was an objection and

13   it was sustained.

14        MR. WHITE:  Withdrawn.

15        MR. KRAWITZ:  And it was sustained.

16        MR. CONNER:  A cash deposit was made on

17   January 5th of 2017 in the amount of $1500.

18   That information is set forth in the ODC

19   documents 3A through 3J.  On January 13th,

20   2017, a $500 deposit, again, reflected in the

21   bank account statement documents.  On January

22   19th, 2017, a $500 cash deposit, again,

23   documented in the bank receipt statements.  On

24   January 30th, 2017, a $300 cash deposit was



Page 122

1      made into the checking account statement.

2              On February 3rd, 2017, a $1300 cash

3      deposit was made.  On February 10th, 2017, a

4      $1500 cash deposit was made into the checking

5      account, made by me into Ms. Fauntleroy's

6      checking account.  On February 13th, 2017, a

7      $1500 cash deposit was made by me into Ms.

8      Fauntleroy's checking account.  On February

9      14th, 2017, a $100 cash deposit was made into

10     Ms. Fauntleroy's checking account.  On

11     February 17th, 2017, a $1600 cash deposit was

12     made by me into Ms. Fauntleroy's checking

13     account.  On February 21st, 2017, a $700 cash

14     deposit was placed into Ms. Fauntleroy's

15     checking account.  On February 24th, a $1200

16     cash deposit was made by me into Ms.

17     Fauntleroy's checking account.  On February

18     27th, 2017 a $1300 cash deposit was made into

19     Ms. Fauntleroy's checking account.

20             On March 3rd, 2017, a $200 cash deposit

21     was made into Ms. Fauntleroy's checking

22     account.  On March 6th, 2017, a $600 cash

23     deposit was made into Ms. Fauntleroy's

24     checking account.  On March 10th, 2017, a



Page 123

1   $1000 cash deposit was made into Ms.

2   Fauntleroy's checking account.  On March 13th,

3   2017, a $1200 cash deposit was made into, made

4   by me into Ms. Fauntleroy's checking account.

5   On March 24th, 2017, a $1400 cash deposit was

6   made by me into Ms. Fauntleroy's checking

7   account.

8        On April 14th, 2017, an $1800 cash

9   deposit was made into Ms. Fauntleroy's

10  checking account.  On April 20th, 2017, a

11  $1200 cash deposit was made by me into Ms.

12  Fauntleroy's checking account.  And on April

13  21st, 2017, a $600 cash deposit was made by me

14  into Ms. Fauntleroy's checking account.

15  Exhibit ODC 3A through 3J will reflect these

16  cash deposits.

17       On April 28th of 2017, I became aware of

18  the fact that I was no longer authorized to

19  make transactions on Ms. Fauntleroy's checking

20  account or on her savings account at Wells

21  Fargo.  I immediately went to Ms. Fauntleroy's

22  residence where I tried to speak to her about

23  what was going on with the checking account.

24       When I got to her house, her caretakers,



Page 124

1    in particular Shelio Thomas and Dana Fox were

2    the two caretakers there.  They would not let

3    me speak to her.  I attempted to call Ms.

4    Fauntleroy to ask her what was going on, why I

5    was removed from the checking account and the

6    savings account.  Ms. Thomas and Ms. Fox would

7    not let me speak to Ms. Fauntleroy.

8        I immediately contacted Lorenzo

9    Fauntleroy, her brother.  And I told him that

10   I was extremely concerned about what was going

11   on with her because I was her Power of

12   Attorney and no one had given me any

13   documentation to indicate that my Power of

14   Attorney had been revoked.  And that I was

15   concerned about her well-being at that time.

16       Her brother attempted to contact her.

17   And to my knowledge, I didn't -- he wasn't

18   able to tell me anything about what was going

19   on.

20       I called and left a message on Ms.

21   Fauntleroy's phone that if she had any

22   concerns about my handling of her funds, to

23   let me know and I would answer any questions

24   that she had.  And that I would give her a



Page 125

1    summary account of any monies that I had

2    handled and any payments that I had made on

3    her behalf.  And that I would return to her

4    the monies that I had access to and had not

5    used.

6         I didn't hear anything from Ms.

7    Fauntleroy.  So on Monday, the following

8    Monday which would have been three days later,

9    I sent a certified bank check to Ms.

10   Fauntleroy along with a summary of accounts

11   which reflected how much money she had in her

12   account, what the expenses were and how much

13   was owed to her.  And I wrote her a check,

14   certified check for $67,708, I believe and 15

15   cents.  I sent it to her certified mail.  And

16   I was able to determine that she had, in fact,

17   received the check and had, in fact, cashed

18   check.

19        I did not hear anything from Ms.

20   Fauntleroy or anybody on her behalf until, I

21   believe, July of 2017 at which time Ms. Thomas

22   contacted me and wanted me to send her any

23   documentation that I had regarding Ms.

24   Fauntleroy.  In particular, any directives



Page 126

1      that I had prepared or anything else that I

2      had filed on her behalf.

3          I sent a package to Ms. Fauntleroy

4      certified mail.  It included copies of her

5      Power of Attorney, Power of Attorney for

6      healthcare, her will, documentation of the

7      documents that I had sent to the IRS regarding

8      payment of her caretakers.  That package was

9      never signed for and returned.  As a matter of

10     fact, let me correct myself.  At the time I

11     sent out the certified check, I sent out these

12     documents to her certified mail in a box.

13     Those documents were never signed for.  And

14     therefore, they were returned to my office.

15         In July of 2017, Ms. Thomas called and

16     asked could she come up to the office and get

17     a copy of those documents.  And she came up.

18     I gave her a copy of the documents and she

19     left.

20         It wasn't until November of 2017 that I

21     was contacted by Disciplinary Counsel with a

22     request for statement.  I had not spoken to

23     Ms. Fauntleroy or any representatives on her

24     behalf until we were in court here today.



Page 127

1       When I did receive a copy of Disciplinary

2    Counsel's Petition for Discipline, as I

3    indicated before, that petition is indicating,

4    indicated in an averment that none of the

5    monies that I had used off of her account were

6    returned to her.

7       And in my response which pretty much

8    speaks for itself, I indicated that money had

9    been returned.  It had been returned in the

10   form of cash deposits that were made to her

11   account as per our agreement, my agreement

12   with Ms. Fauntleroy which was the 23 deposits

13   that I testified to amounting to $33,000.

14   That I had made cash payments on Ms.

15   Fauntleroy's behalf in the amount of

16   $11,846.20.  And that I had returned to her by

17   way of a certified check, $67,708.15.

18       No money was stolen from Ms. Fauntleroy.

19   I had an agreement with her to use her card,

20   not for her to give me any money.  Deposits

21   were made into her account on the dates and

22   the amounts that are set forth here today.

23   And I returned to her the balance of the money

24   that she had in her account when I found out



Page 128

```
1         that I was no longer on the account.

2              And that's my testimony.

3              MS. McBRIDE:  Thank you.

4              MR. KRAWITZ:  Thank you.

5              Mr. White, before you begin your cross,

6         can we take a short break?

7              MR. WHITE:  Sure.

8              MR. KRAWITZ:  Would that be okay?

9              MR. WHITE:  Absolutely.

10             MR. CONNER:  May I be excused to do so as

11        well?

12             MR. SAILLE:  Sure.

13             (Whereupon, a break was taken off the

14        record.)

15             MR. KRAWITZ:  Thank you.  Are you ready

16        to proceed?

17             MR. WHITE:  Yes, sir.

18   BY MR. WHITE:

19        Q    Mr. Conner, you testified on direct that

20   you deposited cash into Ms. Fauntleroy's checking

21   account; is that correct?

22        A    Correct.

23        Q    When did you begin doing that?

24        A    The first cash deposit was made on
```



Page 129

1    December 28th, 2016.

2        Q    Why did you begin depositing cash into

3    Ms. Fauntleroy's checking account?

4        A    Ms. Fauntleroy and I had an agreement

5    that I could use her credit card to make -- to use

6    her credit card at the casinos.  And in December,

7    I began to deposit money, some of the money that I

8    had used up there into her account.

9             And I had spoken to her each month

10   leading up to that identifying with her what had

11   been used on the credit card and what I was going

12   to be repaying to her.

13       Q    So you began using the money in her

14   account in August of 2016, but you didn't deposit

15   any of your funds into her account until December

16   of 2016?

17       A    Incorrect.  I began, I deposited my funds

18   into her account on August 5th of 2016.  And that

19   was the $10,000 that Mr. Fauntleroy had given her

20   to pay me for legal services I had provided from

21   March up until that date.

22       Q    Now that $10,000, was it a check from

23   Lorenzo Fauntleroy?

24       A    It was.



Page 130

1    Q    And you don't have a copy of that check

2  today?

3    A    I do not.  I don't have any, I don't have

4  any access to Ms. Fauntleroy's checking account

5  once I was, my Power of Attorney was revoked other

6  than a couple of bank statements that I had and

7  what you provided to me as part of Discovery.

8    Q    You chose not to subpoena that for the

9  hearing today?

10   A    I didn't subpoena it.

11   Q    Was that check written to you or was it

12  written to Ms. Fauntleroy?

13   A    It was written to Ms. Fauntleroy.

14   Q    Because I believe Ms. Fauntleroy

15  testified that that $10,000 was a loan to her from

16  her brother.  That's not the case?

17   A    That is not the case and that's not my

18  recollection of her testimony.

19        My recollection of her testimony is when

20  I specifically asked her about the $10,000, she

21  said yes, that was the $10,000 check that Mr.

22  Fauntleroy had given to me to pay her expenses.

23  And when I asked her if they included my expenses

24  for my legal services, I believe, my recollection



1   is she said it did.

2       Q    So even though the check was written

3   specifically to Ms. Fauntleroy, that was payment

4   for your legal fee that you chose to deposit into

5   her account?

6       A    That's correct.  The check that he wrote

7   to Ms. Fauntleroy was after a conversation that I

8   had with him saying that she needed money to pay

9   her legal expenses which -- and our conversation

10  initially began with money that she owed me to

11  pay, that she had not paid me for the work that I

12  had done from March all the way up through,

13  through the end of July.  And he gave me that

14  check in particular to pay the expenses to give to

15  her, deposit into her account so that she could

16  pay my expenses for the legal services I had

17  provided.

18      Q    So after August 5th, when was your next

19  cash into her account, your own money?

20      A    It would be the date that I just told

21  you, December 28th.

22      Q    You said, again, you were depositing cash

23  into her account to replenish the funds you spent

24  at the casinos?



Page 132

1      A     That was partially what I was doing.  The

2   other way I was replenishing it, was that I was

3   making cash payments.  I was giving Ms. Fauntleroy

4   cash money that she needed for her living

5   expenses.  I was paying certain bills that I was

6   paying for her.  And I was making those deposits.

7      Q     You mentioned the cash payments on

8   direct.

9      A     Right.

10      Q     So at first you said it was a total of

11   $8424, and then you said it was $11,846 in cash

12   payments.  Which one is it?  Are those two

13   different numbers?  Do they represent different

14   things?

15      A     They do.  The $8424 figure that I gave,

16   that was cash money that I paid out in the way of

17   salaries.  $1120 to Shelio Thomas.  $504 to Dana

18   Fox and $6800 to myself.

19      Q     Okay.

20      A     The $3422.20 figure that I gave was --

21      Q     Hold on.  You gave me $11,846.20.  What's

22   that number?

23      A     I'm explaining it to you.

24      Q     Okay.  I'm sorry.



Page 133

1       A    The $8424 was for cash payments paid in

2    salary.  $1120 to Shelio Thomas, $504 to Dana Fox,

3    $6800 to me.  $3422.20 were cash payments to Ms.

4    Fauntleroy.  $2000, the Petro oil, $1222.20 and

5    the accountants, $200.  And that came to the

6    $11,846.20.

7       Q    Now, on your direct, you only presented

8    one receipt for these payments.  It was RS-26 for

9    $1120 for Ms. Thomas.  Do you have receipts for

10    any of those other payments?

11       A    I do not have receipts for Dana Fox,

12    however, my payments, the $6800 came from ATM

13    transactions that I took.

14       Q    So that $6800 --

15       A    That amounted to $6800.  Not ATM

16    transactions that are included in money at the

17    casino, but separate from that.

18       Q    So I'm confused.  The $6800, is that in

19    addition to or included in the stipulation that's

20    marked as ODC Exhibit 2?

21       A    That's included.  I had written checks to

22    myself, I believe, in the amount of $2700.  There

23    was a $300 -- this is in what's been marked ODC-3A

24    through 3J.  I had written a check to myself for,



Page 134

1    I think it's a $300 check, a $400, a $500 check

2    and a $1500 check which came to $2700.

3           The balance of the $9500 came from ATM

4    withdrawals not including those at the casino in

5    the amount of $6800.  And these funds were, again,

6    paid to me with the permission and the knowledge

7    of Ms. Fauntleroy.

8        Q    So ODC Exhibit 2 details 79 ATM withdraws

9    that you made at various casinos.  And the total

10   amount of those withdrawals were $21,318.24.

11          Your testimony today is that $6800 of

12   that was salary.  What was the rest of it?  Was

13   that not salary?

14       A    I'm sorry, say that again.

15       Q    ODC-2 which you signed this morning says

16   that you withdrew $21,318.24 from ATMs at various

17   casinos.

18       A    Correct.

19       Q    I understand your testimony to be that

20   $6800 of that was your salary.  What's the rest of

21   it?

22       A    No.  Incorrect.

23       Q    The $14,000?

24       A    Incorrect.  The $21,000 that was obtained



Page 135

1    off of the card at the casinos was not part of the

2    $6800.

3        Q    Okay.

4        A    $6800 were other ATM withdrawals, again,

5    that were done on behalf of Ms. Fauntleroy which

6    included the $6800 salary.  So the monies that

7    were withdrawn from the ATM card at the casino,

8    that $21,000 had nothing to do with this salary.

9        Q    Okay.  So in total, you withdrew about

10   $28,000 of ATM transactions from Ms. Fauntleroy's

11   Wells Fargo accounts; is that correct?

12       A    Total.  $21,000 were not on her behalf.

13   $6800 were for my services that I provided for her

14   which is the stipulation.

15       Q    I understand.

16            So you testified you made 23 cash

17   deposits into Ms. Fauntleroy's Wells Fargo

18   account?

19       A    I made 23 deposits into her Wells Fargo

20   also.  22 of them were cash deposits.  One was for

21   the check for $10,000.

22       Q    22 cash deposits.  Do you have a total

23   amount of those deposits, all 22 of them?

24       A    I have a total amount of all 23, which is



Page 136

1    $33,000.

2         Q    So the cash deposits would be $23,000

3    then?

4         A    Correct.

5         Q    Sir, I'm going to show you what I have

6    marked as ODC Exhibit 7.  That is a letter that

7    you wrote to me in response to a letter I wrote

8    alleging you had stolen $80,000 from Ms.

9    Fauntleroy's Wells Fargo account; is that correct?

10        A    No.

11        Q    Can you please tell me what ODC-7 is?

12        A    ODC-7 is my response to your request for

13   Statement of Respondent's position.

14        Q    Correct.

15        A    That's what it is.

16        Q    Okay.  So my request for statement of

17   Respondent's position is ODC-6, correct?

18        A    Correct.

19        Q    In that request for a statement of

20   Respondent's position, I allege that you stole

21   $80,000 from Ms. Fauntleroy's Wells Fargo account;

22   is that correct?

23        A    No.

24        Q    Why is that not correct?


MAGNA
LEGAL SERVICES

1       A    Show me where it is that you allege that.

2   Maybe I missed it.  I don't know or I don't

3   remember.

4       Q    It's on Paragraph 3 through and including

5   what looks like Paragraph 220 -- I'm sorry, 225.

6       A    Can you show me in there where you allege

7   that I stole that money from Ms. Fauntleroy

8   account?

9       Q    I told you.  This. (Indicating)

10      A    No.  This paragraph, if I'm reading

11  correctly, asked me did I make transactions

12  against her account.  And my response to that was,

13  Yes, I did.

14      Q    You are right.  I'm sorry if I was

15  unclear.

16           I allege in this that you authorized

17  point of sale transactions against Ms.

18  Fauntleroy's Wells Fargo's account without her

19  knowledge or authorization.  Is that correct?

20      A    Yes.

21      Q    And ODC-7 --

22      A    And I denied that.

23      Q    But then you stipulated to them?

24      A    No, I did not.  I stipulated that I made



Page 138

1    those transactions.  I specifically say in my

2    response that I did those transactions with her

3    permission and with her knowledge.

4        Q    Okay.  Understood.

5             So ODC-7 was your response to ODC-6,

6    correct?

7        A    Correct.

8        Q    Can you show me in ODC-7 where you say

9    you deposited $23,000 in cash in her account?

10       A    I did not have, I did not put that in

11   there.

12       Q    Why not?

13       A    You didn't ask me that.  I responded.

14   You asked me statements and I gave you my answers.

15   When you asked, when you put in your Petition for

16   Complaint and you allege specifically that I took

17   that money, I had not repaid any of it, I'll go to

18   your Petition for Complaint, your Petition for

19   Discipline, you allege in there, Paragraph 13,

20   that I had not repaid any of the funds improperly

21   used.

22       Q    Correct.

23       A    Then you go on to say that those funds,

24   that I stole those funds.



1      Q    Okay.

2      A    And for the first time, I indicate to

3    you, No, I did not steal those funds.  That I gave

4    her a certified check in the amount of $67,708.15,

5    that I made cash deposits to her account and that

6    I paid some of her expenses by cash.

7           And your response to me after you

8    received my response, was, Mr. Conner, you are

9    alleging for the first time that you returned

10   $67,708.15.  And in my letter to you, I said, No.

11   You allege in your response for a statement, as a

12   matter of fact you acknowledge that I, in fact,

13   sent Ms. Fauntleroy a letter with the certified

14   check for that amount of money.

15     Q    Okay.  Sir, if we can go back to my

16   question.

17     A    Okay.

18     Q    So ODC-7.

19     A    Okay.

20     Q    You would agree with me that nowhere in

21   ODC-7 do you mention depositing $23,000 into Ms.

22   Fauntleroy's Wells Fargo account?

23     A    I would agree to that, and that was not a

24   question asked to me.



Page 140

1     Q    You didn't think that would be relevant

2    in your Statement of Position?

3     A    I put in the Statement of Position my

4    response because I did not know you were alleging

5    that I stole money from her because that's nowhere

6    alleged in your request for a response, for

7    statement.  It's never alleged in there.  It was

8    never alleged until your Petition for Discipline.

9     Q    Let me just explore that with you a

10   little bit.

11    A    Okay.  Again, I asked you to show me

12   where you allege in your request for response that

13   I explained to you why or you say it to me, you

14   allege that I stole this money and ask for my

15   response to that.

16    Q    Okay.  So for example, I'm going to read

17   Paragraphs 3 through 5 to you.  Okay?

18    A    Okay.

19    Q    Paragraph 3.  On August 24th, 2016 you

20   authorized the transaction against Ms.

21   Fauntleroy's checking account in the amount of

22   $535 at Parx Casino in Bensalem, Pennsylvania.

23        Paragraph 4.  The August 24th, 2016

24   transaction at Parx Casino was not for the benefit



Page 141

1   of Ms. Fauntleroy.

2         Paragraph 5.  Ms. Fauntleroy was unaware

3   of the August 24th, 2016 transaction at Parx

4   Casino.

5         You didn't understand those three

6   paragraphs to be alleging that you stole $535 from

7   Ms. Fauntleroy on August 24th, 2016?

8      A    Absolutely not.  Absolutely not.

9   Paragraph 3, you asked me whether or not I did the

10  transaction.  And I did and I have stipulated to

11  that.

12     Q    Okay.

13     A    August 4th -- actually, Paragraph 4.  The

14  transaction at Parx was not for the benefit of Ms.

15  Fauntleroy.  It was not, and I admitted to that.

16        Paragraph 5, Ms. Fauntleroy was unaware

17  of the August 24th, 2016 transaction at Parx

18  Casinos, and I denied that.  I denied that because

19  if I were aware -- if she wasn't aware of those

20  transactions that was there, then I could see more

21  or less you were alleging that I stole her money.

22  But I didn't.  I denied that because that's not

23  true.

24     Q    Okay.  I'm going to move on but I just



Page 142

1    want to make sure I understand.

2              The reason you didn't mention the $23,000

3    in cash deposits that you made into Ms.

4    Fauntleroy's Wells Fargo account in ODC-7 was

5    because I didn't specifically ask you about it in

6    ODC-6?

7        A    You didn't ask me about it at all.  And

8    when you did ask me about it in your Petition for

9    Discipline, I specifically answered it.

10       Q    ODC composite Exhibit 3 which are Ms.

11   Fauntleroy's bank statements, you would agree with

12   me that they don't indicate who made any of those

13   deposits, correct?

14       A    Correct.  But I will also add to that,

15   that I specifically asked Ms. Fauntleroy on her,

16   on cross-examination if she had made any deposits

17   into that account, and she said she had not.

18       Q    Correct.

19       A    And I testified that I did, that I made

20   those transactions.  And I attempted to present

21   receipts that I had gotten from Wells Fargo when I

22   made those transactions which you objected to.

23       Q    They were hearsay.

24              I'm going to show you what I marked as --



1    what you have marked as RS Exhibit 5.

2         A    Yes.

3         Q    This is the accounting.  Now, did you

4    provide Ms. Fauntleroy with that document at any

5    time?

6         A    No, I did not.  I provided Ms. Fauntleroy

7    with a document that I sent her along with the

8    certified check.  And again, as I testified on

9    direct, that I didn't know what was going on at

10   the time.  So I did an accounting based on the

11   documents that I had at the time.  And that's what

12   I set forth in my accounting to Ms. Fauntleroy

13   with the certified check of $67,708.15.

14        Q    You proposed that data accounting which

15   you provide to Ms. Fauntleroy in the May 4th

16   letter as Exhibit RS-4, correct?

17        A    Correct.

18        Q    Do you have that in front of you, sir?

19        A    I do.

20        Q    So why are there two accountings?

21        A    Well, when I got Discovery from you, you

22   provided me with additional bank statements that I

23   was able to review and to be able to establish

24   that I had not accounted for some of the expenses



Page 144

1    in what's been marked as RS-4, which is additional

2    accounting.  I did not have the bank statements

3    which reflected the negative $771.39, the negative

4    balance to begin with.

5              And again, there were additional salaries

6    that had been paid.  And these were salaries that

7    were paid by Ms. Fauntleroy before I took over the

8    account.  So I didn't have any knowledge of them,

9    but they were within that same time frame.

10             And as you recall, initially, Ms.

11   Fauntleroy was responsible on still paying her

12   bills.  I didn't have that information, so I

13   couldn't provide that.  But those are expenses

14   that were paid out of that account during the

15   period of time that's in question.

16       Q    Understood.

17             RS-4, the accounting you did provide to

18   Ms. Fauntleroy.  Do you mention anywhere in that

19   document that you deposited $23,000 into her

20   account?

21       A    No, I do not.

22       Q    Do you mention anywhere in that document

23   that you spent almost $100,000 at various casinos?

24       A    No, I did not.



Page 145

1      Q    Why not?

2      A    Because that was an agreement that I had

3    with Ms. Fauntleroy.  It was not money that she

4    gave me.  This was almost like a loan that she

5    allowed me to use.  So therefore, it didn't --

6    that money was not, I did not need to account for

7    that.

8           I needed to account for the total amount

9    of money that I was in control of, the amount of

10   expenses that I made and what money Ms. Fauntleroy

11   was entitled to receive back.  And that's what's

12   set forth in this accounting of services.

13     Q    So you weren't attempting to conceal

14   those casino transactions by not including them on

15   RS-4?

16     A    Absolutely not.  Those transactions are

17   on every one of those bank statements.  There is

18   not one transaction, either a card transaction at

19   the casino or a withdrawal from an ATM that is not

20   set forth in each one of those monthly checking

21   account statements that went directly to Ms.

22   Fauntleroy and to which Ms. Fauntleroy and I

23   discussed on numerous occasions.

24     Q    Do you still have ODC Exhibit 7 in front



Page 146

1    of you?

2        A    That's my response?

3        Q    Correct.

4        A    Yes.

5        Q    So it's your testimony today that the

6    $100,000 from Ms. Fauntleroy was a loan; is that

7    correct?

8        A    That's not correct.  My testimony today

9    is that Ms. Fauntleroy allowed me to use her

10   checking account to do transactions at the casino.

11       Q    I thought you said it was a loan.

12       A    If I can answer your question.

13       Q    Sure.

14       A    What I'm saying to you is that Ms.

15   Fauntleroy gave me authorization to use her

16   checking account, to use her card at the casinos.

17   That agreement involved me putting back money into

18   her account.

19             I never took $100,000 out of her account

20   because it's not accumulative.  As I would take

21   money out of her card at the casino, I would also

22   deposit money into her account.  So I was

23   depositing money and taking money out.  She didn't

24   have $100,000.  She didn't have $100,000.



Page 147

1          So no, I'm not saying that.  I never took

2     $100,000 from Ms. Fauntleroy.  She didn't have

3     $100,000.  What you are doing is you are taking it

4     and adding it up all up and not take into

5     consideration that I was depositing money, 23

6     deposits into her account during that period of

7     time.  So she didn't have $100,000.  She knows she

8     didn't have $100,000.  She only had $137,385.55 of

9     which $78,384.37 were used by me to pay her

10    expenses.

11        Q    Okay.  So I'm confused again.  Was it a

12    loan or was it not a loan?

13        A    She allowed me to use her cards at the

14    casinos in which I was to pay back those monies

15    that I used.  And I did so, I did so by making

16    cash deposits into her account.

17        Q    That sounds like a loan to me.  So is it

18    a loan?

19        A    You can call it a loan, I guess, if you

20    want to take it like that.  And by the time she

21    revoked, by the time she revoked my Power of

22    Attorney, I went in and I took a look at how much

23    money I had access to that belonged to Ms.

24    Fauntleroy, which again, was the $137,385.55.



Page 148

1    That's the total amount of money that I had access

2    to through that checking account.  And how much

3    money had been spent on her behalf which was the

4    $78, 3784.37.

5            So monies that I had access to that

6    belongs to Ms. Fauntleroy, the balance of those

7    monies was $59,001.18.  And I didn't have all of

8    this information at the time because I was going

9    off of the information I had.  So I returned to

10   her $67,708.15 three days later.  Even though

11   there was no demand for it, I returned that money

12   to her.  And again, that was $8706.97 more than

13   she was entitled to.

14       Q    ODC Exhibit 7.  Can you show me where in

15   that letter -- you don't want to call it a loan.

16   But you say that the understanding was you would

17   repay these funds by making cash deposits into her

18   account?

19       A    Yes.

20       Q    Can you show me where it is in ODC

21   Exhibit 7?

22       A    It's not in here because I wasn't asked

23   that.

24       Q    You weren't asked?  So you receive a



Page 149

```
1    letter saying that you had spent approximately

2    $80,000 from Ms. Fauntleroy's Wells Fargo account.

3       A    Right.

4       Q    I'm sorry.  I lost my train of thought.

5       A    Let me say no, that's not what I

6    understood.

7            MR. KRAWITZ:  There is no question.  Hold

8       on.

9            MR. CONNER:  I said yes, and I'm saying

10      that answer is not yes.

11           MR. KRAWITZ:  He didn't finish his

12      question.  He said he lost his train of

13      thought.

14           Go ahead.

15   BY MR. WHITE:

16      Q    You are saying the understanding was that

17   you had to repay the money.  Why would you not put

18   that in ODC Exhibit 7?  You didn't think it was

19   relevant when ODC-6 alleged that you had spent

20   almost $80,000 from that account?

21      A    ODC-6 has specific averments in it.  It

22   asks me for each transaction, did I negotiate the

23   transaction?  Was the transaction on behalf of Ms.

24   Fauntleroy?  And, Was she aware of the
```



Page 150

1    transaction?

2              I answered each one of those questions

3    truthfully.  There was not a question in there

4    that alleged that I had stolen money from her.

5    And there wasn't any question in ODC-6 asking me

6    to justify or to explain how, what the transaction

7    was.  Do you understand what I'm saying?  There

8    was nothing in ODC-6 asking me that.

9              The first time you asked me about the

10   repayment of those monies or you make any

11   statement regarding the repayment of those monies

12   was in the Petition for Discipline.  And when you

13   asked me in the Petition for Discipline or you

14   assert in the Petition for Discipline that I had

15   taken those funds and had not repaid any of those

16   funds, that's what I answered, that I have, in

17   fact, repaid them.

18             Again, my answer to you was a certified

19   check I gave her, through cash deposits that I

20   gave her, and through cash payments that I made on

21   her behalf.  When I was asked that question in the

22   Petition for Discipline or that assertion was

23   made, I answered it.

24             And you, in turn, wrote me a letter



Page 151

1    saying I didn't know that you had returned any of

2    the money.  But in your request for a statement,

3    you acknowledge that you know that I did because

4    you acknowledge that I had sent her a letter and

5    that I enclosed in that letter a certified check.

6         Q    I'm going to show you what you have

7    marked as RS Exhibit 20 and 21, the Petition for

8    Discipline and your answer.  Can you show me in

9    that document where you say that you deposited

10   $23,000 in Ms. Fauntleroy's Wells Fargo account?

11        A    Paragraph 13, I denied -- bear with me.

12   Paragraph 13 in the petition reads, Respondent has

13   not repaid any of the funds he improperly used as

14   set forth in Paragraph 6.  That's the averment in

15   Paragraph 13.

16             My response to that is, Denied.  It is

17   denied that Respondent improperly used any of the

18   funds set forth in Paragraph 6.  By way of further

19   answer, Respondent repaid these funds to Ms.

20   Fauntleroy in full.  Respondent made cash payments

21   towards Ms. Fauntleroy's expenses, deposited cash

22   directly into her checking account and returned

23   $67,708.15 via certificate check to her on May

24   1st, 2017.



Page 152

1     Q     Is there any other mention in your answer

2     to Petition for Discipline that you made $23,000

3     in cash deposits into her account?

4     A     Any other mention?

5     Q     Correct.

6     A     No.  In response to what?  In response to

7     what question?

8     Q     You tell me.

9     A     You allege that I didn't repay any of the

10    funds.  I'm saying to you that I did repay the

11    funds.  And I repaid them by making cash payments

12    towards her expenses, depositing cash directly

13    into her checking account and returning $67,708.15

14    via certified check to her on May 1st, 2017.

15    Q     So your testimony today is that you

16    deposited $23,000 into her checking account.  That

17    looks like seven words in your answer to Petition

18    for Discipline.  Why wouldn't you elaborate on

19    that more?

20    A     You mean, why didn't I give you the

21    specific amount?

22    Q     Specific amounts, the date it occurred,

23    why you did so.

24    A     I didn't give you the specific amount of



```
 1   how much money was deposited into her account and
 2   I also didn't give you the specific amount of
 3   expenses that were paid.  But I explained to you
 4   that she had been repaid through these different
 5   sources.
 6            And Mr. White, when you look at the
 7   summary of account, the amended summary of
 8   account, the monies that are relevant are monies
 9   that Ms. Fauntleroy had, specifically the
10   $67,708.15.  That's the money that I repaid to her
11   that was left in her account after all of the
12   expenses were paid.  That's the money.  Because
13   deposits that were coming in, the deposits that
14   were coming in, they were, again, they were not --
15   the $100,000 that you are talking about or close
16   to $100,000, again, I was making payments towards
17   that.
18            That wasn't $100,000 of Ms. Fauntleroy's
19   money.  It wasn't $100,000.  She didn't have
20   $100,000 for me to spend at the casino.  She
21   didn't have that.
22        Q    We'll get there in a minute.
23        A    The only way that money was in her
24   account was because I was putting it in there.
```



Page 154

```
1      Q    Sir, let me ask you some questions here.

2      A    Go ahead.

3      Q    $23,000, that's a substantial amount of

4   money.  The Petition for Discipline alleges that

5   you stole $80,000.  That's more than 25 percent of

6   the money that I allege that you stole.  Why did

7   you not say you deposited $23,000 into her

8   account?

9      A    I don't know, Mr. White.  I answered the

10  question.  You alleged that I didn't repay any of

11  the money.  Your averment is that Respondent has

12  not paid any of the funds he improperly used as

13  set forth in Paragraph 6.

14           And my answer is simply, I repaid it in

15  full.  I repaid it by making cash deposits, paying

16  her bills and returning a check to her certified

17  mail.

18     Q    Okay.  So you just testified that Ms.

19  Fauntleroy did not have $100,000; is that correct?

20     A    She didn't have $100,000 for me to spend

21  at the casino when her expenses were -- her

22  expenses were --

23     Q    Did she have $100,000 or did she not have

24  $100,000?
```



Page 155

1      A    -- when her expenses were -- she didn't

2   have $100,000 for me to spend at the casino

3   because she had expenses totaling $78,384.37.

4      Q    I didn't ask you about her expenses.

5      A    That's why I'm saying that she didn't

6   have $100,000 for me to spend at the casinos

7   because I was spending money on her behalf.  And

8   she only had $137,385.55.  And we were paying

9   expenses for her throughout that whole period.

10     Q    In your cross of Ms. Fauntleroy, you

11  discussed an investment transfer, I believe you

12  called it, of $112,000.  Is that correct?

13     A    Correct.

14     Q    Where did that money go?

15     A    That money went into her, went into a

16  savings account.  It was $112,702.60.

17     Q    I'm going to show you what's been marked

18  as ODC Exhibit 3B.

19         MR. KRAWITZ:  3B?

20         MR. WHITE:  3B, correct.

21  BY MR. WHITE:

22     Q    This is a statement from Ms. Fauntleroy's

23  checking account at Wells Fargo for August through

24  September of 2016.  Is that correct?



Page 156

1      A    Yes.

2      Q    On the second page of that document, do

3    you see a deposit on August 23rd in the amount of

4    $7829?

5      A    Correct.

6      Q    Can you please read the description of

7    that deposit?

8      A    Online transfer from Fauntleroy S

9    Reference Number, looks like IBEN9TJK5L savings,

10   initial transfer of funds from investment.

11     Q    Now, if you could turn to Page 4 of that

12   document.

13     A    Could you give me a date?

14     Q    September 12th.

15     A    Yes.

16     Q    Do you see a deposit amount of $5000?

17     A    Yes.

18     Q    Can you read the description for that

19   deposit, please?

20     A    Transfer in branch store from Sarah

21   Fauntleroy DDA, a couple of Xs, 3890, 1101 Old

22   York Road, Abington, $5000 deposit.

23     Q    3890, is that Ms. Fauntleroy's savings

24   account to which the $112,000 investment was



Page 157

```
 1   transferred?

 2        A    I believe so, yes.

 3        Q    I will show you what's marked as ODC

 4   Exhibit 3C.  This is the statement of Ms.

 5   Fauntleroy's Wells Fargo account from September

 6   22016 to October 2016.  Is that correct?

 7        A    Correct.

 8        Q    Turn to the second page of that document.

 9        A    Yes.

10        Q    See a $5000 deposit on December 14th?

11        A    Yes.

12        Q    Can you please read the description of

13   that?

14        A    Online transfer from Fauntleroy S

15   savings, couple of Xs, 3890, Reference number sign

16   IBER74NW5B on 9/14/16.

17        Q    Again, 3890.  That's Ms. Fauntleroy's

18   savings account in which the $112,000 investment

19   was transferred?

20        A    Yes.  That's the only savings account I'm

21   aware of.

22        Q    Do you see another deposit on that page?

23        A    Yes.

24        Q    What's the amount of that deposit?
```



Page 158

```
1      A     $20,000.

2      Q     What's the description of that deposit?

3      A     Online transfer from Fauntleroy S

4    savings, Number of Xs, 3890, Reference # IBEJ2D4B8

5    on 9/21/16.

6      Q     Again, you understand that that $20,000

7    came from Ms. Fauntleroy's savings account into

8    which you deposited the $112,000 investment

9    transfer?

10     A     Correct.

11     Q     If you could turn to Page 3 of this

12   document.  Do you see a $5000 deposit on September

13   29th?

14     A     I do.

15     Q     What's the description of that deposit?

16     A     Online transfer from Fauntleroy S

17   savings, a number of Xs, 3890, Reference

18   #IBE8PZD8F, it looks like G, on 9/29/16.

19     Q     I'm going to move on.

20           Do you still have RS-4 and RS-5 in front

21   of you?

22     A     Yes.

23     Q     The accountings?

24     A     Yes.
```



Page 159

```
1      Q    How did you calculate these figures?

2      A    What do you mean?

3      Q    Were you referring to anything?  Do you

4   have a record of these transactions somewhere?

5   How did you come up with these numbers?

6      A    I came up with them from a combination,

7   mostly from the checking account statements.

8      Q    So the cancelled checks?

9      A    From the checking account statements

10  including the cancelled checks for, the cancelled

11  checks that I have.

12     Q    I'm confused about some of the numbers

13  there.  I'd like to go through them with you if

14  that's all right.

15     A    You asked me a whole lot about these

16  transactions that were deposits from the savings

17  account.  That's where the money was deposited

18  into the savings account, and money was

19  transferred from the savings account over into the

20  checking account.

21     Q    Correct.  I'll move on.

22     A    You understand she wouldn't have had

23  enough money --

24          MR. KRAWITZ:  There is no question.
```



1      There is no question.

2    BY MR. WHITE:

3      Q    So between RS-4 and RS-5, you believe

4    RS-5 has the correct figures; is that correct?

5      A    Yes.

6      Q    For Shelio Thomas, you list a salary of

7    $19,137.50.  Is that correct?

8      A    Yes.

9      Q    Let me show you what you have marked as

10   Exhibit 6A.  Are there any checks on RS-6A for Ms.

11   Thomas?

12     A    Yes.

13     Q    What's the amount?  How many checks?

14     A    It looks like one.

15     Q    What's amount of that check?

16     A    $1941.50.

17     Q    So on 6A, there is one check for Ms.

18   Thomas in the amount of $1941.50, correct?

19     A    Correct.

20     Q    I'll show you what you have marked as RS

21   Exhibit 7A.  Are there any checks for Ms. Thomas

22   on RS Exhibit 7A?

23     A    Yes.

24     Q    How many?



Page 161

1    A    Two.

2    Q    Two?

3    A    Yes.

4    Q    What about on the other pages?

5    A    Three.  Well, there was two on that first

6    page.  There is one on the second page, and there

7    are two on the third page.

8    Q    So it sounds like five checks for Ms.

9    Thomas on 7A?

10   A    Yes.

11   Q    What are dates and amounts of all five of

12   those checks?

13   A    One is dated August 19th, 2016 in the

14   amount of $440.  One is dated -- let me go back.

15   One is dated 8/19/2016 for $440.  One is dated

16   8/26/16 in the amount of $308.  One is dated

17   August 12th, 2016 in the amount of $319.  One is

18   dated September 7th, 2016 in the amount of $231.

19   And one is dated September 9th, 2016 in the amount

20   of $231.

21   Q    So I calculate the total of those five

22   checks to be $1529.  Does that sound accurate to

23   you?

24   A    Yeah.  I take your word for it.  I didn't


MAGNA
LEGAL SERVICES