Page 162

1    add them.

2        Q    I'll show you what you have marked as RS

3    Exhibit 8A.  Can you tell me how many cancelled

4    checks are on that document for Ms. Thomas?

5        A    It looks like four.

6        Q    What are the dates and the amounts of

7    those checks?

8        A    One is dated September 15th, 2016 in the

9    amount of $231.  One is dated September 29th, 2016

10   in the amount of $231.  One is dated October 7th,

11   2016 in the amount of $253.  One is dated

12   September 23rd, 2016 in the amount of $231.

13       Q    Would you agree with me that the sum of

14   those four checks is $946?

15       A    I mean I didn't add them up, but that

16   sounds about right.

17       Q    I'm going to show you what you have

18   marked as RS Exhibit 9A.  How many checks for Ms.

19   Thomas are on Exhibit RS 9A?

20       A    It looks like four.

21       Q    What are the dates and amounts of those

22   four checks?

23       A    One is dated October 14th, 2016 in the

24   amount of $440.  One is dated October 20th, 2016



Page 163

```
 1    in the amount of $400.  One is dated October 27th,

 2    2016 in the amount of $440.  And it looks like one

 3    is dated November 3rd, 2016 in the amount of $320.

 4         Q    I calculate the total of those four

 5    checks to be $1600.  Does that sound right to you?

 6         A    It sounds about right.

 7         Q    I'm showing you what you have marked as

 8    RS Exhibit 10A.  How many checks for Ms. Thomas

 9    are on Exhibit RS-10A?

10         A    Five.

11         Q    What are the dates and amounts of those

12    checks?

13         A    One is dated November 10th, 2016 in the

14    amount of $440.  One is dated November 18th, 2016

15    in the amount of $360.  One is dated November

16    25th, 2016 in the amount of $410.  One is dated

17    December 2nd, 2016 in the amount of $400.  One is

18    dated December 9th, 2016 in the amount of $400.

19         Q    Is that all five?

20         A    Yep.

21         Q    I calculate the sum of those five checks

22    to be $2010.  Does that sound correct to you?

23         A    Without adding it up, it sounds about

24    right.
```



Page 164

1     Q     I'm showing you what you have marked as

2     RS Exhibit 11A.  How many checks for Ms. Thomas

3     are on Exhibit RS-11A?

4     A     It likes like four.

5     Q     What are the dates and amounts of those

6     checks?

7     A     The first one is January 4th, 2017 in the

8     amount of $530.  There is one dated December 16th,

9     2016 in the amount of $410.  One is dated

10    December, looks like 21st, 2016 in the amount of

11    $640.  One is dated December 28th, 2016 in the

12    amount of $5500.

13    Q     I calculate the sum of those four checks

14    to be $2140.  Does that sound correct to you?

15    A     That sound about right, yeah.

16    Q     I'm going to show you what you have

17    marked as RS Exhibit 12A.  How many checks for Ms.

18    Thomas are on RS Exhibit 12A?

19    A     Four.

20    Q     What are the dates and amounts of those

21    checks?

22    A     The first check is January 13th, 2017 in

23    the amount of $560.  Another check dated January

24    31st, 2017 in the amount of $600.  Another check



Page 165

```
 1   dated February 3rd, 2017 in the amount of $560.

 2   Another check dated January 20th, 2017 in the

 3   amount of $860.

 4       Q    I calculate the sum of those four checks

 5   to be $2580.  Does that sound correct to you?

 6       A    It sounds about right.

 7       Q    When I add up the totals for those six

 8   exhibits for checks to Ms. Thomas, I calculate

 9   $12,746.50.  Does that sound correct to you?

10       A    If that's what you added up, yes.

11       Q    You can check my arithmetic.

12       A    Okay.  What did you say it was?

13       Q    $12,746.50.  I understand you also paid

14   Ms. Thomas $1120 in cash which was evidenced in RS

15   Exhibit 26.  Is that correct?

16       A    That's correct.

17       Q    So adding that to the $12,000 figure, I

18   get $13,866.50.

19       A    Okay.

20       Q    RS Exhibit 5 you say Ms. Thomas' salary

21   was $19,137.50 and RS-4 you say her salary was

22   $16,888.  Where is the rest of the money?

23       A    These checks that you have here are the

24   only checks that I have.  There are bank
```



Page 166

1    statements that I don't have.  There are bank

2    statements, bank statement checks that I don't

3    have.

4            The accurate way of being able to

5    determine what, how much money was paid by Ms.

6    Thomas would be better reflected in a document

7    that I sent you which would be the checking book

8    transaction account that I have as well as the

9    bank statements that I have.  That would reflect

10   more accurately what monies were paid to Ms.

11   Thomas.

12           These are just, these are just checks.

13   If I can go back real quick and take a look at

14   them.  There were monies paid to Ms. Thomas prior

15   to August 11th, 2016 that are not reflected in

16   these checks.  And if you want me to, I can tell

17   you exactly how much money that was.

18       Q    Prior to when?

19       A    The first checks that you asked me to

20   look at, I believe, begin with 7A.  Is that

21   correct?

22       Q    6A.  There was one check for Ms. Thomas

23   on 6A in the amount of $1941.50.

24       A    I'm sorry.



1    Q    Just so the record is clear --

2    A    I'm sorry.  I see that.

3         So there are checks that are reflected

4    for July, it looks like August, September,

5    October, November, December, January and February.

6    There are no checks reflected from February into

7    March or March into April up until the time that

8    my Power of Attorney was revoked.  I didn't have

9    -- the exhibits that you, that we introduced which

10   I believe was ODC 3A through ODC 3J did not

11   include any checks, copies of any checks.  But

12   these are checks that I gave to you as part of

13   Discovery that I had, that I had.  But those other

14   months' checks are not there.

15   Q    So there are more checks that you wrote

16   to Ms. Thomas that have been negotiated that are

17   not reflected on 6A through 12A?  Is that your

18   testimony?

19   A    Correct.

20   Q    And your testimony --

21   A    And I don't know, I don't know whether or

22   not your -- whether you reflected the amount of

23   money that was paid in cash.  Did you add that?

24   Q    I'm aware of one cash transaction, the



Page 168

1   $1120 to Ms. Thomas.  And I included that in the

2   $13,866.

3       A    Correct.  So there would be checks that

4   are not, that are not, that are not included for

5   February, from February 11th to the end of

6   February, all of March and all of April up until

7   April 27th there are no checks there.  And it was

8   only -- every payment that she got was via check

9   except for there were two payments that were made

10  to her, cash payments that were made to her

11  totally that the cash amount that was given to

12  her.  All the rest were checks.

13      Q    How did you come up with that figure,

14  then, if you didn't have those checks?

15      A    Because I have, I have the receipts for

16  them.

17      Q    What receipts?

18      A    The bank statements.  I kept a bank log,

19  every check that was written.

20      Q    You mean a transaction register?

21      A    Transaction register, correct.

22      Q    I believe you proposed that as Exhibit

23  RS-40, correct?

24      A    Correct.



Page 169

1     Q    Do you have that in front of you, sir?

2     A    RS-39 and RS-40.

3     Q    I want to talk about RS-40.

4          So just to be clear.  You are confident

5     about the accuracy of RS-40?

6     A    Yes.

7     Q    I'm showing you what's been marked as ODC

8     Exhibit 3I.  On RS-40, do you see a Check Number

9     4372 to Ms. Thomas in the amount of $560?

10    A    Yes.

11    Q    If you could turn to Page 2 of ODC-3I.

12    A    Okay.

13    Q    A little more than halfway down the page

14    March 21st, do you see a transaction that says

15    NSF, return item fee for transaction received on

16    March 20th, $560, Check Number 4372?

17    A    Yes.

18    Q    So that check was not successfully

19    negotiated, correct?

20    A    It was not successfully negotiated at the

21    time it was presented on March 21st.  I don't know

22    whether or not it was subsequently resubmitted.

23    Q    You didn't go back to check the accuracy

24    of RS-40 to see if it was resubmitted and



Page 170

1    negotiated successfully?

2        A    I didn't have this, this bank statement.

3        Q    So you were unaware that that check had

4    been denied for insufficient funds?

5        A    To my knowledge, yeah, I wouldn't have

6    known unless Ms. Thomas told me about it, that she

7    had gone there and it wasn't sufficient funds and

8    then I told her to redeposit it.  I don't know.

9    That may have happened.  But I didn't have this

10   bank statement from March 11th, 2017 through April

11   12th.

12            But I can tell you that whenever a check

13   was written and there weren't sufficient funds, I

14   noted on my log.  And if you go down further on

15   there to Check 4380 and 4382, those checks were

16   voided.  And I indicated in it that they were paid

17   in cash.  So if the check had not been cashed, I

18   would have made a notation to it on this document.

19       Q    Okay.  So RS-40, do you have another

20   Check 4374 to Ms. Thomas in the amount of $560?

21       A    Yes.

22       Q    Do you see an entry on ODC-I directly

23   below the one I just referenced that was also

24   returned for insufficient funds in the amount of



Page 171

1    $480?

2       A    Correct.  Yes.

3       Q    And on Page 3 of ODC 3I, do you see that

4    that check was also returned for insufficient

5    funds on April 11th?

6       A    Yes.

7       Q    So do you think it's possible that the

8    $19,137.50 figure in RS-5 is not accurate?

9       A    No.  I disagree with that.  Ms.

10   Fauntleroy testified I paid all of the caretakers

11   including Ms. Thomas every week.  They never

12   missed a week without being paid.

13          So my answer to you is that if this check

14   was deposited and was insufficient, that

15   eventually that check was cashed because every

16   week her caretakers, including Ms. Thomas, were

17   paid.  There was never a week that they weren't

18   paid.

19      Q    Can you show me on 0DC-3I where any of

20   those checks we just referenced as being returned

21   were negotiated successfully?

22      A    No, that wouldn't be reflected on here.

23      Q    Why not?

24      A    I don't think it would be reflected on



Page 172

1    here.

2        Q     Wouldn't they have to account for it?  If

3    it was successfully negotiated, then the funds

4    came out of the account.  Wouldn't it be reflected

5    on the statement?

6        A     It may be.  I'm looking at it right now.

7    It may be.  But I can guarantee you that those

8    checks that you just named amounted to over a

9    couple of thousand.  And if Ms. Thomas was working

10   and didn't get paid over a couple of thousand

11   dollars, Ms. Fauntleroy would have known about it

12   and Ms. Fauntleroy wouldn't have testified here

13   today that all of her caretakers would have been

14   paid each week what they were owed.

15       Q     You testified that you calculated the

16   figures on RS-5 by using the cancelled checks and

17   your transaction register.  And if the transaction

18   register includes checks that were not

19   successfully negotiated, wouldn't that affect the

20   accuracy of the numbers on RS-5?

21       A     No.

22       Q     Why not?

23       A     What I did, the way I calculated again,

24   when I was calculating the numbers, I didn't have



Page 173

1    this bank statement.  So I was going by my check

2    log to the checks that I wrote, who I wrote them

3    to and the amounts that were paid.

4        Q    That was my question.  You are using your

5    check log which includes checks that were not

6    successfully negotiated.  So therefore, the

7    figures on RS-5 would be higher than the amount of

8    money Ms. Thomas actually received, correct?

9        A    No.  The amount of money that's on RS-5

10   are monies that my records show in combination

11   with the bank statements were paid to her

12   caretakers including Ms. Thomas.  That's where I

13   came up with those numbers.

14            So you went through a number of checks

15   that I had -- a number of documents that I had

16   checks that were written from her.  And you are

17   saying that doesn't come up to $19,000.

18            My response to you is that I didn't have

19   checks for all of the accounts, all of the bank

20   statements.  So I had to rely on my bank, my bank

21   transaction log which I did to come up with that.

22   And I have written out -- if you want me to, I can

23   go through with you every --

24       Q    That's not necessary, sir.



Page 174

1      A     I'm willing to do it because I have every

2    --

3      Q     You can do it on redirect.

4            MS. McBRIDE:  There is no question.

5            MR. KRAWITZ:  There is no question

6      pending.

7            MR. WHITE:  There is not.

8            MR. CONNER:  But my answer is, I think he

9      said I have no documentation for this.  My

10     answer is I do have it.

11   BY MR. WHITE:

12     Q     Mr. Conner, I'm going to move on.  But I

13   just want to be clear.  Did you inflate the

14   numbers in RS-4 or RS-5 in order to conceal the

15   fact that you spent $100,000 of Ms. Fauntleroy's

16   funds at various casinos?

17     A     No.

18     Q     Mr. Conner, how well did you know Ms.

19   Fauntleroy prior to July 29th, 2016?

20     A     I had gotten to know her pretty well.

21     Q     Does it seem unusual to you that she

22   would permit you to use her card for her Wells

23   Fargo account at various casino?

24     A     I'm sorry.  What was the question again?



Page 175

1       Q     Does it seem unusual to you that she

2    would permit you to use the card for her Wells

3    Fargo account at various casinos?

4       A     No, because that is what she did.

5       Q     Have you done this with other people?  Do

6    other people let you use the card for their

7    accounts at various casinos?

8       A     I have never -- not that I can think of.

9    I have never worked for someone for five months or

10   say for over a year and not demanded to be paid.

11   Very few instances have come up in the 20 years

12   that I practiced that I wasn't getting retainer

13   money up front or make sure that I was getting

14   paid.  Mr. Lorenzo Fauntleroy was a client of

15   mine.

16      Q     Sir, the question was whether other

17   people have permitted --

18           MR. CONNER:  Can I answer the question?

19           MR. KRAWITZ:  Answer his question.  You

20       weren't answering his question.  You can

21       answer his question.

22           MR. CONNER:  His question to me was, had

23       I ever done that before?

24           MR. KRAWITZ:  Correct.



Page 176

1            THE WITNESS:  My answer to him is that I

2       was explaining to you when I did do it.

3    BY MR. WHITE:

4       Q    So yes, you have done that before?  So

5    yes, you have done that before?

6       A    I have done that before.  And under these

7    particular circumstances, I did it because I was

8    dealing with an 85-year-old woman who wanted to

9    remain in her house.  And I have been blessed that

10   I could afford to work for her for that period of

11   time and not demand the monies that I was doing.

12           So me and Ms. Fauntleroy had a different

13   kind of relationship and she appreciated it -- or

14   at least she indicated to me she did.

15      Q    So it's your testimony that you entered

16   into an agreement with Ms. Fauntleroy to use the

17   card for her Wells Fargo account at various

18   casinos so that she could remain in her house?

19      A    No.  What I'm saying to you is my

20   relationship with her, I'm explaining to you I did

21   things for her that I would not normally do.  And

22   we had a very, very good relationship.  So yeah,

23   based on the total of our relationship, we did and

24   I did ask her and she did agree to allow me to do



Page 177

```
 1    that because we did have a very personal

 2    relationship, a very personal relationship.

 3        Q    So I was unclear in your answer to my

 4    initial question.  Other people have let you use

 5    the cards for their accounts at various casinos?

 6        A    I don't remember any particular --

 7    whether or not anybody let me use their card.

 8        Q    You don't remember if someone let you use

 9    her card for a casino?

10        A    No, I don't remember.  I don't remember

11    whether someone has done that or not.  I'm not

12    going to say that I have never done that.

13             But I what I will say to you is that I

14    have developed personal relationships with my

15    client.  And under those personal relationships, I

16    have done different things for different people

17    under personal relationships.  I have.

18        Q    And this doesn't seem like an unusual

19    arrangement to you?

20        A    Absolutely not.  It's not an unusual

21    relationship because on August 1st -- on July

22    29th, 2016, Ms. Fauntleroy didn't have any money

23    at all to pay her bills, none at all.  And as of

24    right now, because of me and because of the work
```



Page 178

1   that I did with Ms. Fauntleroy, she was able to

2   stay in her house.  She was able to stay in her

3   house, and I believe she is still in her house

4   right now.

5         And again, based on the testimony and the

6   information that I have given, Ms. Fauntleroy was

7   better off financially.  She got $8000 more than

8   what she was entitled to because of my concern for

9   her.  I paid that money to her when I didn't have

10   any documentation whatsoever.

11      Q   I'm confused again.

12      A   Okay.

13      Q   You said a couple times that she didn't

14   have any money in August of 2016.  Why then would

15   she say, Take my debit card and go to the casinos?

16   Does that seem unusual to you?  I have no money,

17   Mr. Conner, here is my debit card?

18      A   She did that because I had put $10,000

19   into her account.  And she trusted me to make sure

20   that any money that I used from there, that I

21   would give back to her.  That's why for all of

22   those months from July all the way through, Ms.

23   Fauntleroy never complained to me or complained to

24   anybody else about that because she trusted me to



1    make sure that any monies that I would have used,

2    that I would have given back to her.

3           And again, throughout the course of those

4    months, I constantly talked to her about that.  So

5    there was never any concern from her that she

6    wasn't going to get her money.

7    Q    Mr. Conner, tell me about the

8    conversation in which Ms. Fauntleroy gave you

9    permission to use her debit card at various

10   casinos.

11   A    The best I can recall is that I was in

12   Atlantic City and I was down there for -- this is

13   the best of my recollection, that I was down there

14   on vacation.

15   Q    When?  When was this?

16   A    I don't know.  It would have been

17   sometime -- this is the best of my recollection.

18   And that I had asked her if I could use her card

19   while I was down there in Atlantic City, and she

20   told me that I could use it.

21          I didn't use it while I was down there.

22   I didn't use it when I was down there.  When I got

23   back, I told her I hadn't used it.  But I asked

24   her, Is it okay if I use your card when I'm at the



Page 180

1    casino?

2        Q    This was on the phone?

3        A    It was initially on the phone, but I

4    didn't use her -- I didn't use her card.

5        Q    There was more than one conversation?

6        A    Yeah.  It was several conversations about

7    this.

8        Q    Several conversations?

9        A    Yes.  When I came back to her, we talked

10   about it again.  I explained to her, I didn't use

11   your card when I was down there.

12       Q    So if you had several conversations with

13   her when she said you could use her debit card at

14   the casinos, why would she testify this morning

15   that she never told you that?

16       A    I don't know.

17       Q    You have no explanation for that?

18       A    No.

19       Q    Why would she file a complaint with my

20   office?

21       A    I have my reasons.  Do you want to know

22   why I think she would have said that?

23       Q    Yes.  That's why I asked.

24       A    In December of 2016, I went to all of Ms.



Page 181

1    Fauntleroy's caretakers including Shelio Thomas.

2    And I told them that they needed to execute a W-9

3    because I needed to report to the IRS monies I had

4    paid them for caretaking services.

5         I had told them when I first started

6    helping Ms. Fauntleroy pay back in August of 2016,

7    that I was going to be issuing them this W-9.  And

8    one of the reasons I told them that was because I

9    wanted to make sure that Ms. Fauntleroy had done

10   what she was required to do as far as monies that

11   were paid.  And that I wasn't withholding any

12   taxes out of that money.

13        So when I went in December, and issued

14   W-9s to Shelio Thomas who was her head caretaker,

15   the other caretakers seemed to be okay with that,

16   but Ms. Thomas wasn't.  And about a month later

17   when she went to file her tax returns, she found

18   out that she had to pay taxes on that money.  And

19   she was very, very, very, very upset by that.

20   Because when Homer Hills was handling her account,

21   they were getting paid -- they never had to pay

22   any taxes at all.  And from that point on, my

23   relationship with Ms. Thomas went completely down

24   the hill.



Page 182

```
 1              Now, when I found out on April 28th that
 2    I was no longer on Ms. Fauntleroy's account, it
 3    had been revoked, I tried to get in touch with Ms.
 4    Fauntleroy, and I couldn't.  I became very, very
 5    concerned about what was going on to the extent
 6    that I called the police and I told them that I
 7    was concerned about her, that I had not been able
 8    to be in touch with her and I could not get in
 9    touch with her.
10              And the police came to the house.  And
11    they were able to knock on the door and confirm
12    Ms. Fauntleroy was okay.  And I became very, very
13    upset.
14              I subsequently found out that Mr. -- the
15    attorney that testified had prepared a Revocation
16    of Attorney.  So I called him and I left him
17    messages because I still didn't know what was
18    going on.  I was concerned at that point in time
19    that I needed to find out what was going on.  This
20    attorney wasn't calling me back.  He eventually
21    called me back and told me that he only handled
22    debt one incidents.
23              At that time, Mr. White, I was conflicted
24    out because I knew if I raised an issue about the
```


MAGNA
LEGAL SERVICES

1    care and what was going on with Ms. Fauntleroy,

2    that she wouldn't be able to stay in that house.

3    She wouldn't have had any caretakers at the time.

4           But my relationship went completely

5    downhill with Ms. Thomas.  And if you are asking

6    me about why I think she would be raising this

7    right now is because I believe she is conflicted

8    out, too.  If Shelio Thomas is telling her to do

9    one thing, she knows she needs these people to

10   take care of her.

11          And that's the reason why I didn't go and

12   file a complaint on my own, because I know she

13   needs to stay in her house and they are there to

14   take care of her.  She has no other family.

15       Q    Let me cut to the chase.  You believe Ms.

16   Fauntleroy is lying because you made Ms. Thomas

17   pay federal taxes, federal income taxes?  Is that

18   what you are saying?

19       A    I think it almost amounts to that.  I

20   believe Ms. Thomas was very upset with me because

21   we never had any problems whatsoever.  There were

22   never any complaints about anything I had done up

23   until I got into that argument with Ms. Thomas.

24   So that's the only thing I can say that I know.


MAGNA
LEGAL SERVICES

Page 184

1    Nothing else ever happened.  There was never any

2    harsh words.  There was never any demands for any

3    money.  There was never any accusations by Ms.

4    Fauntleroy that I had ever mishandled any of her

5    funds, never.  Even after the complaints were

6    filed.  Up to this day, I have not had any

7    conversation with Ms. Fauntleroy since on or about

8    April 24th of 2017.

9        Q    Sir, do you still have ODC-7 in front of

10   you?

11       A    Which one is that?

12       Q    Your Statement of Position in response to

13   ODC-6.

14       A    Yes, I do.

15       Q    Do you mention in that document that you

16   believe Ms. Fauntleroy is lying because you made

17   Ms. Thomas pay federal income tax?

18       A    If there is a question -- I don't believe

19   there was a question that asked me whether or not

20   I believe she was lying.

21       Q    You didn't mention that because it wasn't

22   specifically asked?

23       A    It wasn't specifically asked.  So no, I

24   didn't, I didn't put that in there.  No.



1      Q     Do you have your answer to the Petition

2    for Discipline in front of you still?

3      A     I do.

4      Q     Do you mention in that document you

5    believe Ms. Fauntleroy is lying because you forced

6    Ms. Thomas to pay federal income taxes?

7      A     No.

8      Q     Why not?

9      A     Because I wasn't asked that.  I mean I

10   don't understand.

11     Q     So you don't think it would have been

12   relevant in your Statement of Position to let my

13   office know that Ms. Fauntleroy had reason to lie

14   about this?

15     A     Well, what question are you asking me did

16   Ms. Fauntleroy lie about?  The fact that I stole

17   money from her?

18     Q     It's your testimony that Ms. Fauntleroy

19   lied this morning because you made Ms. Thomas pay

20   income taxes?

21     A     No.  No.  You asked me why I think she

22   may have misrepresented.  I said because I had a

23   falling out with Ms. Thomas and she relies on Ms.

24   Thomas to take care of her so she can stay in her



Page 186

1    home.

2         Q    You didn't mention any of that in ODC-7?

3         A    No.

4         Q    I'm going to move on.

5              You said you spoke, on several occasions

6    Ms. Fauntleroy gave you permission to use her card

7    at various casinos, correct?

8         A    Correct.

9         Q    Did you ever ask Ms. Fauntleroy to sign a

10   document that authorized you to use a card at the

11   casinos?

12        A    No, I did not.

13        Q    Why not?

14        A    Because I didn't think it was necessary.

15        Q    Why not?

16        A    Because she told me that I could, and I

17   did.  And she knew about it.  We talked about it.

18   We talked about it as it was reflected in bank

19   statements that she had and it was never a problem

20   with it.  She never accused me of stealing any

21   money or taking any money from her without her

22   consent.  We talked about it.  So no, there was

23   no, there was no need for me to do that.

24        Q    You couldn't envision a situation in the



Page 187

1   future someone might question a fact you were

2   using her debit card in the casino?

3       A    Not at that time.

4       Q    You didn't think it was necessary to put

5   this in writing?

6       A    No, I did not.  I did not.

7       Q    Did you memorialize your conversations

8   with her in any way?

9       A    I did not.

10      Q    You didn't send her a letter about this?

11      A    No.

12      Q    You didn't write a memo to the file about

13  it?

14      A    Again, I didn't do that.  Looking back

15  hindsight, I wish I would have done that.  But

16  again, based on the relationship that I had with

17  Ms. Fauntleroy, I didn't think that it was

18  necessary for me to do that.  It didn't even cross

19  my mind to do that.

20           I took money out of my pocket to give her

21  when she needed to pay her caretakers, money that

22  I should have gotten.  We had a different kind of

23  relationship there.  I understand now I'm here

24  because I'm an attorney and these things can



**MAGNA**◗
**LEGAL SERVICES**

Page 188

1    happen.  But at the time, no, I didn't.

2             I wouldn't normally either pull money out

3    of my pocket and pay for anybody, a client's

4    bills.  I wouldn't do that.  I wouldn't work for

5    someone for over a year and not get paid for my

6    services.  But this was a unique situation.  We

7    had a personal relationship.  So no, I didn't do

8    it.  In hindsight, I should have.

9        Q    In any of these conversations, did Ms.

10   Fauntleroy place any limitations on your use of

11   her card?

12       A    No, she did not.

13       Q    Did she say, You can spend $1000 a month?

14       A    No.

15       Q    Did she say, I want a cut of whatever you

16   win?

17       A    No, she did not.

18       Q    Was there ever, when you had these

19   conversations with Ms. Fauntleroy, was there ever

20   anyone else in the room who heard them?

21       A    No.  I made sure that there was no one

22   else there.

23       Q    It was always just you and her?

24       A    Ms. Fauntleroy and I talked.  We talked



MAGNA
LEGAL SERVICES

Page 189

 1    about business.  We talked about her accounts.  I

 2    made sure that no one else heard that.  And the

 3    reason I did that is because the same people that

 4    were involved in access to her accounts when she

 5    ran into problems during that period of March of

 6    2016 through the end of July of 2016 were still

 7    working for her.  So no, I didn't discuss any of

 8    her business with them.

 9        Q    Where did these conversations happen?

10        A    It happened at her house.  Ms. Fauntleroy

11    has never been to my office.  Every week almost I

12    went to her office -- her house.  Excuse me.

13        Q    How many of these conversations did you

14    have with her where she said it was okay for you

15    to use her debit card at the casino?

16        A    I don't know exactly how many.  We talked

17    frequently about it.

18        Q    How about approximately?  Can you

19    ballpark it for me?

20        A    No.

21        Q    You don't have any idea?

22        A    I couldn't ballpark.  But because of her

23    experience that Ms. Fauntleroy had prior, we

24    talked about her finances.  We talked about them.



Page 190

1     We looked at her bank statements that came to her

2     house.  We went over those things.  And my use of

3     her debit card from her account came up all the

4     time.  She never said a word about it.  Nothing.

5          Q    Sir, I'm going to direct your attention

6     to ODC Exhibit 7, specifically Paragraph 226.

7          A    ODC-7?

8          Q    It's in your right hand.

9          A    Paragraph what?

10         Q    226.

11         A    Okay.

12         Q    Can you read your response to Paragraph

13    226, please?

14         A    I have to look at -- what was the

15    question?

16         Q    ODC-6 is the Request for Statement

17    Authorization.

18         A    I need to look at the question.  226?

19         Q    Correct.

20         A    Do you want me to read it?

21         Q    If you could read Paragraph 226 of ODC-7?

22         A    I have read it.

23         Q    Read it aloud, please.

24         A    The question is, On April 27th, 2017, Ms.



Page 191

1    Fauntleroy revoked the General Durable Power of

2    Attorney that she had executed in your favor on

3    July 29th, 2016.

4            My answer is, Admitted in part, denied in

5    part.

6            It is admitted that the General Durable

7    Power of Attorney that Ms. Fauntleroy executed on

8    July 29th, 2016 was revoked on or about April

9    27th, 2017.

10           By way of further answer, Ms. Fauntleroy

11   was in poor health both physically and mentally at

12   the time the POA was revoked.  And therefore, it

13   is denied that she was capable of making a knowing

14   and intelligent decision to revoke the POA.

15           By way of still further answer,

16   Respondent was not notified that the POA was

17   revoked and that the account was closed until

18   Friday, April 28th, 2017.

19   Q    Mr. Conner, is it your testimony today

20   that in April of 2017, Ms. Fauntleroy was

21   incapable of making knowing and intelligent

22   decisions?

23   A    It's my testimony that she was in poor

24   health and at times when I would go to see her,



Page 192

1    she seemed non-respondent at some times.  I had

2    not received a copy of a revocation of the POA.

3    When I had summoned the police to her house, and I

4    went in and I spoke to Ms. Fauntleroy about the

5    revocation of the POA, she was unable to -- she

6    acted like she knew nothing about it and she

7    wasn't able to answer any of my questions

8    regarding the revocation of the POA.  She wasn't

9    able to answer any of my questions.

10       Q    I believe you said she was non-respondent

11   at times.  Do you believe --

12       A    No. No. No.  When I went there on April

13   28th, when I found out that the POA had been

14   revoked and Ms. Thomas and Ms. Fox would not let

15   me speak to her and I called the police, I went

16   into the house.  I asked Ms. Fauntleroy had she

17   revoked my Power of Attorney?  And she looked at

18   me and she wasn't, was not able to answer my

19   questions or to respond to my questions.

20       Q    So on one occasion she was

21   non-respondent?

22       A    Right.  Right.  On that last occasion,

23   yes.

24       Q    Did it occur to you that her health



1    problems could have prevented her from consenting

2    to letting you use her debit card at various

3    casinos?

4        A     Absolutely not.  When she agreed to allow

5    me to use her debit card at the casino as she

6    testified, Ms. Fauntleroy was fine.  She had some

7    physical limitations.  But she was in control of

8    what happened with her checking account.

9            I never wrote a check or made any

10   decisions or did anything on that card, paid any

11   bills on that card, took any money or made any

12   transactions without her permission and her

13   knowledge.

14       Q    So Ms. Fauntleroy's health deteriorated

15   so rapidly in the nine months you served as Power

16   of Attorney that in April she was capable of

17   making known and intelligent decisions but in

18   August of 2016 she was not?

19       A    I'm not a doctor and I can't testify as

20   to the deterioration process.  When I last spoke

21   to her which was on April 28th of 2017 and I asked

22   her about the revocation of the Power of Attorney,

23   she was not able to explain to me anything

24   regarding that.



1              And therefore, in my answer, I put on

2      there that she did not appear at the time of this

3      revocation, because that's what this paragraph is

4      about, to be able to answer any questions

5      regarding this Power of Attorney.

6         Q    Mr. Conner, in your answer to the

7      Petition for Discipline, you say that Ms.

8      Fauntleroy authorized your $9500 salary.  Can you

9      describe the conversation in which Ms. Fauntleroy

10     authorized this salary?

11        A    Sure.  Every time that I withdrew any

12     money out of the account or any time I wrote a

13     check, whenever I wrote a check to myself, again,

14     I believe there were three or four checks that I

15     wrote to myself, Ms. Fauntleroy gave me permission

16     to write those checks, the amount that was in

17     those checks for services that I provided.  And

18     whenever I used her card to take money out of the

19     accounts, I got her permission to do that and

20     explained to her that I was taking that as part of

21     my salary.

22        Q    Did she specifically authorize the amount

23     of $9500 at any time?

24        A    No.  I never asked her if I could take



Page 195

1    $9500 out of her account because I never took that

2    amount out at one time.

3        Q    I'm not following.

4        A    Ms. Fauntleroy agreed to pay me at

5    different times by check and agreed to allow me to

6    take money out of her account for services that I

7    rendered to her.

8        Q    But she never authorized the amount of

9    $9500?

10       A    She authorized every time I took money,

11   either wrote a check or took money out, she

12   authorized the amount of that check or the amount

13   that was withdrawn.  And when it was all said and

14   done, it was $9500.

15            And I believe that when I gave all of the

16   caretakers a W-9 for IRS, she also signed off on

17   monies that I had taken out up to that point,

18   which would have been the end of 2016.  And I

19   believe that amount was $5500 at that point.  So I

20   gave her a slip for me for a W-9 for me as well.

21       Q    And all of these authorizations were

22   verbal?

23       A    Correct.

24       Q    There is no document authorizing you to



MAGNA
LEGAL SERVICES

Page 196

1    pay yourself a salary in the amount of $9500?

2        A    No.

3        Q    There is no fee agreement with Ms.

4    Fauntleroy?

5        A    There was no written fee agreement.  I

6    normally would have set up a written fee agreement

7    back in March when I first started working for

8    her, but she had no money at that time.  And

9    that's the reason why I didn't keep track of every

10   hour that I worked for her.  We agreed, though,

11   that the $10,000, we agreed on the $10,000.  I

12   didn't want to charge her an hourly rate.  She

13   didn't have any money.

14       Q    So you never actually discussed the $9500

15   salary?  It was just, Hey, Ms. Fauntleroy, I'd

16   like to pay myself $1500.  And she says, Mr.

17   Conner, that's okay.  And you take the money?

18   That's the relationship?

19       A    No.  What I did is I went to Ms.

20   Fauntleroy and I asked her if I could take out

21   money for my services.  I did that by way of

22   checks that she authorized me to write.  I believe

23   there were three or four of those checks.  And

24   then there were cash deposits that were taken out



1    of the account.

2           At the end of December, I gave Ms.

3    Fauntleroy a W-9 which reflected the monies that I

4    had taken out up to that point.  And had I still

5    been on, I would have given her another one in

6    December of 2017.

7    Q    How many of these conversations did you

8    have with her where she authorized you to pay

9    yourself a salary or a payment towards your

10   salary?

11   A    I think it was probably, I think there

12   were four checks, so it would have been for each

13   of those checks.  And I don't remember where I'm

14   talking to you right now, the balance of $6800, I

15   don't remember in what amounts were taken out.  I

16   don't remember.

17   Q    So you don't know how many of these

18   conversations you had with Ms. Fauntleroy?

19   A    I had a conversation with her every time

20   that I did.  I don't remember how many

21   transactions were made with me taking money out.

22   But I never took any money out, I never used that

23   card for anything without Ms. Fauntleroy's

24   permission and knowledge.  Never.



Page 198

1    Q    Mr. Conner, is it your testimony today

2    that you reimbursed Ms. Fauntleroy for every penny

3    you spent at the casinos that is reflected in ODC

4    Exhibit 1 and 2?

5    A    It's my testimony that any monies that I

6    had that I was in control of that Ms. Fauntleroy

7    had and that were not used for her care or used

8    directly for her benefit were returned to her.

9    Q    So yes or no?  Have you reimbursed her

10   for the money you spent at the casino or not?

11   A    I have returned any money I have used for

12   Ms. Fauntleroy -- of Ms. Fauntleroy's, I have

13   reimbursed her.  For any monies that I spent for

14   Ms. Fauntleroy, I have accounted for and

15   reimbursed her for every dime of that.  And in

16   addition to that, an additional $8000 for any

17   money that I used of Ms. Fauntleroy.  Yes.

18   Q    Do you know what the total amount of

19   money you spent at the casino was specifically Ms.

20   Fauntleroy's money as opposed to your money you

21   deposited into her account?

22   A    No, I don't.

23   Q    Why not?

24   A    Well, again, I used her card.  But I also



Page 199

1    deposited money into her account.  The only thing

2    I can tell you is how much money Ms. Fauntleroy

3    had access to that I, in turn, had access to from

4    August 1st of 2016 through April 27th of 2017.

5           I know how much money Ms. Fauntleroy had

6    and how much I had access to.  I know what portion

7    of that money was used for her benefit as of April

8    27th of 2017.  And that portion of her money that

9    was not used for her benefit I returned to her.

10   Q    I'm just a little confused how you can

11   say you reimbursed Ms. Fauntleroy for every penny

12   that you spent of hers at the casino if you don't

13   know what that amount of money is.  Can you

14   explain that to me?

15   A    I'm going to try again.

16          Ms. Fauntleroy, between August 1st of

17   2016 and April 27th of 2017, the total amount of

18   money that Ms. Fauntleroy had, period, was

19   $137,385.55.  That's the total amount of money she

20   had money which I could use at the casino or

21   anywhere.  That's the total amount of money that

22   she had.  And during that period of time, she had

23   expenses, money that was paid out of that money

24   for her benefit in the amount of $78,384.37.



Page 200

```
1          So as of April 27th of 2017, the only
2    money that she would have had, period, would have
3    been $59,001.18.  That's the only money she would
4    have had because she didn't have any more money.
5         Q    I think I understand.
6         A    And I returned, I returned $67,708.15.
7         Q    I think I understand.  What you are
8    saying is the figures on RS-5 are correct.
9    Accordingly, Ms. Fauntleroy was entitled to
10   $59,001.18 and you provided her more than that.
11   Therefore, you had to have reimbursed her for
12   every penny of hers you spent at the casinos?  Is
13   that your testimony?
14        A    Correct.  Correct.
15             MR. WHITE:  I have nothing further.
16             MR. KRAWITZ:  Redirect, so to speak?  I
17        don't know that we need -- I think we have
18        covered it.
19             MR. CONNER:  No redirect.
20             MR. KRAWITZ:  Any questions?
21             We are going to take a two-minute
22        adjournment to consult.
23             MR. KRAWITZ:  Mr. Conner, I have a couple
24        questions.
```



1          MR. CONNER:  Okay.

2          MR. KRAWITZ:  Let me make sure I have the

3     correct amount.  The certified check for

4     $67,708.15, from what bank was that?

5          MR. CONNER:  Santander.

6          MR. KRAWITZ:  Was that your account?

7          MR. CONNER:  Yes.

8          MR. KRAWITZ:  Go ahead.

9          MR. CONNER:  What happened is that the

10    monies were taken out of an account for me and

11    my wife.  I deposited them into an IOLTA

12    account to transfer over to Ms. Fauntleroy.

13         MR. KRAWITZ:  You were returning to her

14    $67,708.15?

15         MR. CONNER:  Correct.

16         MR. KRAWITZ:  Of money that belonged to

17    her?

18         MR. CONNER:  Yes.

19         MR. KRAWITZ:  You took that as was

20    sitting in an account that belonged to you

21    personally or you, your firm?

22         MR. CONNER:  Me personally.

23         MR. KRAWITZ:  Along with you on that

24    account was your wife?



Page 202

```
 1            MR. CONNER:  Yeah.  It was an account
 2       that I think was in her name, but the funds
 3       were my funds.
 4            MR. KRAWITZ:  When you say they were your
 5       funds --
 6            MR. CONNER:  My personal funds.
 7            MR. KRAWITZ:  But this is money that was
 8       Ms. Fauntleroy's money?
 9            MR. CONNER:  It was money that was owed
10       to Ms. Fauntleroy.
11            MR. KRAWITZ:  It was her money?
12            MR. CONNER:  Yeah.  It was money that was
13       owed to Ms. Fauntleroy.  And when she took me
14       off of her account, I paid that money to her
15       because again, I had used her card at the
16       casino.  Some of the money I had used of hers
17       at the casino I had paid back to her by making
18       deposits.
19            MR. KRAWITZ:  I'm only talking about
20       $67,000.
21            MR. CONNER:  The $67,000 was the amount
22       of money that I had access to that belonged to
23       Ms. Fauntleroy.
24            MR. KRAWITZ:  That money that belonged to
```



1    Ms. Fauntleroy was in your personal bank

2    account?

3         MR. CONNER:  It was in my bank account

4    because she had agreed to allow me to use that

5    money.  So she had given the money to me to

6    use with the understanding that I would pay it

7    back.  So it originated from hers, but she had

8    given me the right to use it.

9         MR. KRAWITZ:  How much did you win at the

10   casino using her money?

11        MR. CONNER:  I don't know.

12        MR. KRAWITZ:  Can you estimate?

13        MR. CONNER:  As a matter of fact, usually

14   when I go to the casino and it's all said and

15   done, I have lost.  I lose more than I win.

16        MR. KRAWITZ:  So you were using Ms.

17   Fauntleroy's money to gamble and you were

18   losing her money?

19        MR. CONNER:  Ms. Fauntleroy had given me

20   her card to use at the casino with the

21   understanding that I would give that money

22   back to her.  So she, in essence, was saying,

23   You can use my card.  It wasn't that I was

24   taking her money and just going to the casino



Page 204

1    and using it.  She had given me permission to

2    use her money with the understanding that I

3    would pay the money back to her.  She never

4    made a demand for it.  But once I was taken

5    out off of her account, I gave it all back to

6    her.

7         MR. SAILLE:  Mr. Conner, why did you not

8    use your own card at the casino?

9         MR. CONNER:  Well, to be quite honest

10   with you, I don't keep so much money on my

11   card.  So I was at the casino and I didn't

12   have any more money on my card and I wanted to

13   gamble more, then I would use her card.

14        MR. SAILLE:  So you used your card at

15   times, too?

16        MR. CONNER:  Yes.  Yes.  And I would have

17   never -- again, I would have never used her

18   card without her permission to do so.

19        MR. SAILLE:  You said you made your first

20   payment back, other than this $10,000 loan,

21   you made the first payment on December 28th of

22   2016, correct?  It was a good four months

23   almost, right?

24        MR. CONNER:  Yes, that's when I made the



Page 205

```
 1      first cash deposit.
 2          MR. SAILLE:  Why did you take four months
 3      to start paying her back?  Why didn't you do
 4      it monthly if it was a loan you described it?
 5          MR. CONNER:  Well, she knew and I knew
 6      that I had given her, in essence, $10,000.  So
 7      for the first few months, it certainly wasn't
 8      any concern of hers because she knew that I
 9      had given her $10,000 that I was supposed to
10      get.
11          But coming around December, her funds,
12      again, started shrinking.  And I know that she
13      needed for me to start reimbursing her for
14      monies that I had used at the casino.  And she
15      and I talked about that.
16          MR. SAILLE:  Was there anything in
17      writing between you and Mr. Lorenzo about this
18      transaction with the $10,000?
19          MR. CONNER:  No.  No.  Again, Mr.
20      Fauntleroy felt bad because I was constantly
21      in touch with him.  He knew what was going on
22      and he knew I was working.  He knew I wasn't
23      getting paid for it.
24          He was a client of mine.  I worked for
```



Page 206

1       him and that's why I was doing this, part of

2       the reason I was doing this.

3            MR. SAILLE:  Was he available to testify

4       today?

5            MR. CONNER:  As far as I know, he was.

6       He was available.  Shelio Thomas was

7       available.  I don't know because I haven't

8       spoken to him in awhile.  But my

9       understanding, he is alive; as far as I know.

10           MS. McBRIDE:  I have a question about

11      him.  So he wrote a check for $10,000 to his

12      sister?

13           MR. CONNER:  Correct, to pay me.

14           MS. McBRIDE:  You are claiming that was

15      for you.  Why didn't he write you a check?

16           MR. CONNER:  I told him, These are

17      services I'm providing for your sister so the

18      money needs to come from your sister.  So he

19      wrote the check to his sister so that I could

20      get paid out of her account.

21           MS. McBRIDE:  What evidence do you have

22      that that check he wrote to his sister was for

23      you?

24           MR. CONNER:  Evidence I have is that



1    that's what he wrote the check for.  And I'm

2    sure that if Mr. Fauntleroy was here, he would

3    testify to that.

4        MS. McBRIDE:  Let me ask you a question

5    about the credit card.  Is it your testimony

6    that the agreement you had with Ms.

7    Fauntleroy was that you could only use the

8    card at the casino?  You couldn't use it for

9    gas or groceries?  Just for the casino?

10        MR. CONNER:  Correct.  That was my

11   understanding.  I did not have her authority

12   to use that credit card for anything other

13   than that.

14        MS. McBRIDE:  So for the riskiest thing

15   you could do, go to a casino.  She gave that

16   you permission but not for anything else?

17        MR. CONNER:  I didn't ask permission to

18   use it for anything else and I didn't want

19   permission to use it for anything else.  It

20   was specifically for that.

21        MS. McBRIDE:  For the casino?

22        MR. CONNER:  I never asked her to use it

23   for anything else.  Like I testified before, I

24   never used that card without her knowing about



Page 208

```
 1      it and without her permission.  I never made

 2      one transaction.  And even those transactions,

 3      I made sure -- I didn't go to the ATM and take

 4      out $1000 and then run up to the casino and

 5      use it because I wanted the record to show

 6      where it was coming from.

 7          MS. McBRIDE:  Did you call her every

 8      night when you were at the casino?  Any time

 9      you were there, you called her to get

10      permission before you put the card in the

11      machine?

12          MR. CONNER:  Most of the times, I did.

13      I'm not saying that I always called her to do

14      it.  But I certainly spoke to her like -- I

15      usually went down there I would say probably

16      maybe every week that I went down there.  And

17      when I went down there, I would talk about

18      what bills she wanted me to pay.  And I would

19      also find out what caretakers had worked for

20      her, how many hours they had worked for her

21      and what they were to get paid.

22          And during that conversation, I would

23      tell her about how much money she has and what

24      money I used.  And when she got her bank
```



```
 1        statements, I went in there.  I would talk to

 2        her about what's in the bank statements.  So

 3        she knew.  I always talked to her about that.

 4             MS. McBRIDE:  Thank you.

 5             MR. KRAWITZ:  I'd like you to try and

 6        answer my question.  But actually, let me ask

 7        it a little different way.

 8             If you went down on a given night and we

 9        have all of withdrawals at that time

10        casinos -- I'm just going to use the amount,

11        for sake of my question I'm going to say

12        $1000.  And you took $1000 of Ms.

13        Fauntleroy's money off of her card and you

14        tripled it, did you have some agreement with

15        her what would you give her out of those

16        winnings?

17             MR. CONNER:  No.

18             MR. KRAWITZ:  What did you do when you

19        won?  What did you do with the money, the

20        additional money over and above what you were

21        taking off of her card?

22             MR. CONNER:  If I went there and I won

23        some money?

24             MR. KRAWITZ:  Put $1,000 in and won
```


MAGNA
LEGAL SERVICES

Page 210

```
1       $2000.  What did you do with the $1000?

2            MR. CONNER:  I kept it.

3            MR. KRAWITZ:  You didn't give any back to

4       Ms. Fauntleroy since it was her money you are

5       gambling?

6            MR. CONNER:  I didn't give any money

7       because when it was all said and done, I never

8       won any money from the casinos.  In 2016, I

9       didn't win money from the casino.  I lost

10      money.

11           MS. McBRIDE:  Is it your testimony even

12      on a given night you didn't win any money?

13           MR. CONNER:  I may have won some money on

14      a given night.  Yes.

15           MS. McBRIDE:  What did you do with those

16      winnings?

17           MR. CONNER:  I kept them.

18           MS. McBRIDE:  Thank you.

19           MR. CONNER:  And what I may have done is

20      used them the next time I went in, in which

21      case I would have lost them because in the

22      end, I never won any money at the casino.  I

23      never won any money from any of the monies

24      that I used off of the card.  I didn't win any
```



Page 211

1    money at all.

2         MS. McBRIDE:  But you did win on a given

3    night, correct?

4         MR. CONNER:  I could have won on a given

5    night.

6         MS. McBRIDE:  Did you win on a given

7    night?  Yes or no.

8         MR. CONNER:  But I don't know whether I

9    won with Ms. Fauntleroy's money.  I used my

10   money -- it may have been a night I came out

11   of the casino I may have won some money.  But

12   I can't sit here and tell you that was Ms.

13   Fauntleroy's money because I had my own

14   personal money as well.  What I can tell you

15   is that I never made any money off of Ms.

16   Fauntleroy's money.

17        MS. McBRIDE:  You just said you couldn't

18   tell us one way or another.

19        MR. CONNER:  I lost money at the casino,

20   so I never won any money, period.

21        MS. McBRIDE:  But on a given money you

22   did, and some of that money might have been

23   Ms. Fauntleroy's?

24        MR. CONNER:  It could have been, yes.

